**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

Electronically Filed
Intermediate Court of Appeals
CAAP-21-0000024
25-FEB-2022
07:46 AM
Dkt. 111 OP

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

FOR OUR RIGHTS, a Hawaiʻi corporation,
Diana Lomma, David R. Hamman, Randi Hamman, Janet Eisenbach,
Levana Lomma Keikaika, Lawrence K. Paille, Geralyn Schulkind,
Leonard Schulkind, Daniel Hoshimoto, Christina Cole,
Francesca Woolger, Naʻea Lindsey, Michael Mazzone,
Lanette J. Harley, and Loraine L. Patch, Plaintiffs-Appellants,
v.
DAVID IGE, in his official capacity as Governor
of the State of Hawaiʻi, HOLLY T. SHIKADA, in her official
capacity as Attorney General for the State of Hawaiʻi,
and STATE OF HAWAIʻI, Defendants-Appellees

NO. CAAP-21-0000024

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CASE NO. 5CCV-20-0000091)

FEBRUARY 25, 2022

LEONARD, PRESIDING JUDGE, AND MCCULLEN, J., AND
NAKASONE, J., CONCURRING IN PART

OPINION OF THE COURT BY LEONARD, J.

This case primarily addresses whether Hawaiʻi Governor David Ige exceeded his statutory authority when he issued a series of proclamations declaring a state of emergency in response to the Covid-19 pandemic. For the reasons set forth herein, we hold that Hawaii's Emergency Management Act (defined below) authorizes the Hawaiʻi Governor to declare the existence of a state of emergency *whenever*, in his or her sole judgment, the Governor finds that circumstances giving rise to a declaration of a state of emergency have occurred (or that there is imminent danger or threat of an emergency), regardless of whether a prior emergency proclamation has been issued based on the same, continuing, and/or otherwise related circumstances. On that basis, we affirm in part the trial court's judgment, but we vacate the trial court's judgment to the extent it was based on mootness.

Plaintiffs-Appellants For Our Rights, a Hawaiʻi corporation, Diana Lomma, David R. Hamman, Randi Hamman, Janet Eisenbach, Levana Lomma Keikaika, Lawrence K. Paille, Geralyn Schulkind, Leonard Schulkind, Daniel Hashimoto, Christina Cole, Francesca Woolger, Naʻea Lindsey, Michael Mazzone, Lanette J. Harley, and Loraine L. Patch (collectively, **For Our Rights** or **Appellants**)[1] appeal from the December 23, 2020 Final Judgment

_____

[1] It appears that Plaintiff-Appellant Daniel Hashimoto passed away during the pendency of this appeal with no substitution of a representative.

(**Judgment**) entered by the Circuit Court of the Fifth Circuit (**Circuit Court**) against them and in favor of Defendants-Appellees David Ige, in his official capacity as Governor of the State of Hawaiʻi (**Governor Ige**), Holly T. Shikada, in her official capacity as Attorney General for the State of Hawaiʻi, and the State of Hawaiʻi (**Appellees**).[2]  Appellants also challenge the Circuit Court's November 19, 2020 Order Granting Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (**Dismissal Order**).

I.   BACKGROUND

A.   Covid-19 Emergency Proclamations

On March 4, 2020, Governor Ige issued a proclamation (**Initial Proclamation**) in response to the Covid-19 pandemic, pursuant to Hawaii Revised Statutes (**HRS**) §§ 127A-2, -12, -13, -14, -16, -30 (Supp. 2019). By its terms, the Initial Proclamation continued through April 29, 2020.[3]  The Initial Proclamation provided, *inter alia*, numerous references to the United States Centers for Disease Control and Prevention, World Health Organization, and United States Secretary of Health and Human Services, declaring Covid-19 an international concern.  The Initial Proclamation, *inter alia*, authorized emergency relief and

---

[2]     The Honorable Kathleen N.A. Watanabe presided.

[3]     Office of the Governor, Proclamation (2020), https://governor.hawaii.gov/wp-content/uploads/2020/03/2003020-GOV-Emergency-Proclamation_COVID-19.pdf.

emergency management functions, suspended various statutes, and prohibited the increase of the selling price of various commodities, including food, water, medical supplies, and cleaning supplies.

Through the date of this Opinion, Governor Ige has issued subsequent Covid-19-related proclamations on March 16, 2020, March 21, 2020, March 23, 2020, March 31, 2020, April 16, 2020, April 25, 2020, May 5, 2020, May 18, 2020, June 10, 2020 (Ninth Supplementary Proclamation Related to the Covid-19 Emergency (**Ninth Proclamation**)), July 17, 2020 (Tenth Proclamation Related to the Covid-19 Emergency (**Tenth Proclamation**)), August 6, 2020 (Eleventh Proclamation Related to the Covid-19 Emergency Interisland Travel Quarantine (**Eleventh Proclamation**)), August 20, 2020 (Twelfth Proclamation Related to the Covid-19 Emergency), September 22, 2020 (Thirteenth Proclamation Related to the Covid-19 Emergency), October 13, 2020 (Fourteenth Proclamation Related to the Covid-19 Emergency), November 16, 2020 (Fifteenth Proclamation Related to the Covid-19 Emergency), November 23, 2020 (Sixteenth Proclamation Related to the Covid-19 Emergency), December 16, 2020 (Seventeenth Proclamation Related to the Covid-19 Emergency), February 12, 2021 (Eighteenth Proclamation Related to the Covid-19 Emergency), April 9, 2021 (Ninteenth Proclamation Related to the Covid-19 Emergency), May 7, 2021 (Twentieth Proclamation Related to the Covid-19 Emergency Quarantine for Travel Between Counties), May

25, 2021 (<u>Amendment</u> Nineteenth Proclamation Related to the Covid-19 Emergency), June 7, 2021 (Twenty-First Proclamation Related to the Covid-19 Emergency), August 5, 2021 (Emergency Proclamation Related to the Covid-19 Response), October 1, 2021 (Emergency Proclamation Related to the State's Covid-19 Delta Response), November 29, 2021 (Emergency Proclamation Related to Covid-19), January 26, 2022 (Emergency Proclamation Related to Covid-19 (Omicron Variant)), and February 5, 2022 (<u>Amendment</u> Emergency Proclamation Related to Covid-19 (Omicron Variant)).

B.   <u>Procedural History</u>

For Our Rights filed a complaint on September 1, 2020, and a First Amended Complaint (the **Complaint**) on September 24, 2020.  The Complaint alleged that the individual plaintiffs, along with other people in Hawaiʻi, were suffering and would continue to suffer from numerous harms as a result of Governor Ige's Covid-19-related proclamations, including the specific harms to the plaintiffs that were identified in the Complaint, including but not limited to anxiety, prevention of travel to see family, lost employment, destruction of business, lost income and other heavy financial losses, lost business opportunities, lost mental health care and other health care services, loss of freedom, serious emotional distress, depression, hopelessness, homelessness, isolation, social exclusion, pain, injury to health, alienation, fear, suicidal thoughts, and other deprivations.

The Complaint asserted two causes of action (**Count I and Count II**). In Count I, the Complaint alleged, *inter alia*, that Governor Ige's Ninth, Tenth, and Eleventh Proclamations are unconstitutional and exceed the authority statutorily delegated by the Hawaiʿi Legislature to the Hawaiʿi Governor to declare an emergency and promulgate rules and regulations to facilitate the government response to such declared emergency, and that Appellants are suffering harms directly related to the continued application and enforcement of those and any preceding supplemental proclamations. More specifically, Count I alleges that, under the Hawaiʿi Constitution, the Governor does not hold an enumerated power to declare states of emergency and that the emergency powers statutorily conferred by the Legislature to the Governor are expressly limited to a period not to exceed 60 days. Count I further alleges that Governor Ige's use of supplemental proclamations is an unauthorized attempt to circumvent the Legislature's express 60-day limit and therefore, the Ninth, Tenth, and Eleventh Proclamation, and any and all such supplemental proclamations, exceed the Governor's statutory and constitutional authority.

In Count II, the Complaint further alleged, *inter alia*, that Governor Ige's Ninth, Tenth, and Eleventh Proclamations are unconstitutionally vague and deprive Appellants of due process under the constitutions of the State of Hawaiʿi and the United

States.  Appellants did not challenge Governor Ige's Initial Proclamation.

The Complaint sought, *inter alia*, declaratory and injunctive relief with respect to the Ninth, Tenth, and Eleventh Proclamations, as well as any and all further supplemental proclamations, including a declaration that such supplemental proclamations are unconstitutional, invalid, null, and void, and that Appellees (among others) be enjoined from enforcing them.

On October 8, 2020, Appellees filed a Motion to Dismiss Plaintiffs' First Amended Complaint (**Motion to Dismiss**), arguing that the Complaint in its entirety should be dismissed for failure to state a claim upon which relief can be granted, and contending that:  (1) because Appellants did not challenge the subsequent emergency proclamations that were then in effect, Appellants lack standing and their claims are moot; (2) Governor Ige's emergency proclamations are fully authorized under HRS chapter 127A; and (3) Appellants' void-for-vagueness arguments failed to meet applicable legal standards.

On November 9, 2020, Appellants filed a memorandum in opposition in which they argued, *inter alia*:  (1) the Complaint is not moot because the controversy is capable of repetition yet evading review, the public interest exception to the mootness doctrine applies, and contrary to Appellees' contention, injunctive and declaratory relief remain justiciable based on the Complaint's allegations; (2) neither the Hawaiʻi Constitution nor

HRS chapter 127A confer unlimited and unreviewable powers on the Governor; and (3) unless the applicable statutes impose an enforceable limitation, the Governor's authority to declare an emergency amounts to a blank check to usurp legislative power and here, Governor Ige's proclamations have ignored and therefore failed to avert their catastrophic impacts and protect the welfare of the people of the Hawaiʻi. Appellees filed a reply memorandum contending, *inter alia*, that the restrictions in the emergency proclamations have saved lives and that the proclamations were based on reassessments and evolving circumstances.

On November 17, 2020, a hearing was held on the Motion to Dismiss and the matter was taken under advisement. On November 19, 2020, the Circuit Court entered the Dismissal Order granting the Motion to Dismiss with prejudice, and stating:

> The Court agrees with, and hereby incorporates, the arguments presented by the Defendants. Specifically, Haw. Rev. Stat. ("HRS") chapter 127A, as properly interpreted, does not support Plaintiffs' claim. The language, purpose, and history of HRS chapter 127A all demonstrate that the Governor is empowered to issue supplementary emergency proclamations extending beyond a single 60-day period. Further, Plaintiffs' claim in regards to the vagueness of prior emergency proclamations, which are no longer in effect, is deemed moot and is dismissed with prejudice.

The Judgment was entered on December 23, 2020. For Our Rights timely filed a notice of appeal on January 18, 2021. After the appeal was fully briefed, oral arguments were heard on January 26, 2022.

II.  POINTS OF ERROR

Appellants raise five points of error on appeal, contending that the Circuit Court erred:  (1) in its interpretation of HRS chapter 127A; (2) in the Dismissal Order by adopting Appellees' arguments without further reasoning; (3) by tacitly adopting Appellees' arguments that Governor Ige may exercise emergency powers for an indefinite period of time; (4) by tacitly adopting Appellees' arguments that the Complaint was moot; and (5) by tacitly adopting Appellees' arguments that Appellants lacked standing on the grounds of mootness.

III. APPLICABLE STANDARDS OF REVIEW

The Hawaiʻi Supreme Court has held:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief.  The appellate court must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory.  For this reason, in reviewing a circuit court's order dismissing a complaint the appellate court's consideration is strictly limited to the allegations of the complaint, and the appellate court must deem those allegations to be true.

Kealoha v. Machado, 131 Hawaiʻi 62, 74, 315 P.3d 213, 225 (2013) (brackets and ellipses omitted) (quoting County of Kauaʻi v. Baptiste, 115 Hawaiʻi 15, 24, 165 P.3d 916, 925 (2007)).  That said, "the court is not required to accept conclusory allegations on the legal effect of the events alleged."  Id. (citation omitted).

"A circuit court's ruling on a motion to dismiss is reviewed de novo."  Id. (citation omitted).

A circuit court's interpretation of a statute is a question of law, which is reviewed *de novo*, as is a court's determination of an issue of standing. State v. Castillon, 144 Hawaiʻi 406, 411, 443 P.3d 98, 103 (2019) (citation omitted) (statutory interpretation); Tax Found. of Hawaiʻi v. State, 144 Hawaiʻi 175, 185, 439 P.3d 127, 137 (2019) (standing). Mootness is an issue of subject matter jurisdiction, and therefore, is a question of law reviewed *de novo*. Hamilton ex rel. Lethem v. Lethem, 119 Hawaiʻi 1, 4-5, 193 P.3d 839, 842-43 (2008).

IV. DISCUSSION

A. HRS Chapter 127A

The Circuit Court granted Appellees' request to dismiss Count I of the Complaint for failure to state a claim upon which relief can be granted, based on the court's conclusion that:

> [HRS] chapter 127A, as properly interpreted, does not support Plaintiffs' claim. The language, purpose, and history of HRS chapter 127A all demonstrate that the Governor is empowered to issue supplementary emergency proclamations extending beyond a single 60-day period.

Appellants' primary contention on appeal is that the Circuit Court erred as a matter of law in its interpretation of key provisions of HRS chapter 127A, in particular HRS § 127A-14 (Supp. 2019), which provides in relevant part:

> **§ 127A-14 State of emergency.** (a) The governor may declare the existence of a state of emergency in the State by proclamation if the governor finds that an emergency or disaster has occurred or that there is imminent danger or threat of an emergency or disaster in any portion of the State.
> . . . .
>
> (c) The governor . . . shall be the sole judge of the existence of the danger, threat, or circumstances giving

10

rise to a declaration of a state of emergency in the State. . . . This section shall not limit the power and authority of the governor under section 127A-13(a)(5).

(d)  A state of emergency . . . shall terminate automatically sixty days after the issuance of a proclamation of a state of emergency . . ., or by a separate proclamation of the governor . . ., whichever occurs first.

(References to mayoral powers and local states of emergency omitted).

Appellants do not dispute that HRS § 127A-14(a) authorized Governor Ige's declaration of a state of emergency in the Initial Proclamation.  Rather, Appellants contend that, on its face, HRS § 127A-14 limits the Governor's emergency powers to a single, 60-day period.  Appellants rely on subsection (d) of HRS § 127-14, which states that "[a] state of emergency shall terminate automatically sixty days after the issuance of a proclamation of a state of emergency, or by a separate proclamation of the governor, whichever occurs first."  (Cleaned up).

The plain language of HRS § 127A-14(d) provides for the automatic termination of any state of emergency no later than 60 days after the issuance of a proclamation of a state of emergency.  Alternatively, a state of emergency can be terminated sooner, by means of a separate proclamation of the governor declaring that the emergency is over.  Id.  Accordingly, as agreed by all parties to this appeal, Governor Ige's Initial Proclamation, issued on March 4, 2020, terminated automatically no later than 60 days after March 4, 2020.

The disputed issue is whether Governor Ige acted beyond his statutorily-granted authority when he issued subsequent emergency proclamations in response to the same emergency – in this case, the worldwide outbreak of Covid-19 – notwithstanding the continuing nature of the emergency.  Appellants urge this court to interpret HRS § 127A-14(d) as a hard limit on the Governor's use of emergency powers, one 60-day period only, one and done.  Appellants point to, *inter alia*, the extraordinary nature of the powers given to the Governor under chapter 127A, describing them as broad, arbitrary, unreviewable, unilateral, unchecked, and far-reaching.  However, Appellants (and Appellees) candidly admit that the Circuit Court did not reach any sort of constitutional challenge to the statute; such issues are not properly before us on appeal.  See generally Zanakis-Pico v. Cutter Dodge, Inc., 98 Hawaiʻi 309, 319 n.19, 47 P.3d 1222, 1232 n.19 (2002) (because the circuit court did not reach a question, the supreme court did not reach it either); see also City & Cty. of Honolulu v. Sherman, 110 Hawaiʻi 39, 56 n.7, 129 P.3d 542, 559 n.7 (2006) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (citation omitted).  The question before this court is limited to whether the statute itself prohibits the Governor from declaring more than one state of emergency, lasting no longer than 60 days, per emergency, and concomitantly, whether the statute authorizes

the Governor to issue more than one emergency proclamation – in this instance, numerous emergency proclamations collectively spanning a period of years – in response to essentially the same emergency.

HRS § 127A-14(d) does not expressly state that the Governor is precluded from issuing more than one emergency proclamation based on the same emergency, although it provides that any state of emergency terminates automatically in 60 days, if it is not terminated sooner.  Thus, we consider this provision in the context of the entirety of HRS chapter 127A (the **Emergency Management Act** or the **Act**).

HRS § 127A-1 (Supp. 2019) sets forth the Legislature's intent to provide comprehensive powers to the Governor to act when faced with "emergencies of unprecedented size and destructiveness" as follows:

> **§ 127A-1  Policy and purpose.**  (a)  Because of the existing and increasing possibility of the occurrence of disasters or emergencies of unprecedented size and destructiveness resulting from natural or man-made hazards, and in order to ensure that the preparations of this State will be adequate to deal with such disasters or emergencies; to ensure the administration of state and federal programs providing disaster relief to individuals; and generally to protect the public health, safety, and welfare, and to preserve the lives and property of the people of the State, it is hereby found and declared to be necessary:
>
> (1)  To provide for emergency management by the State, and to authorize the creation of local organizations for emergency management in the counties of the State;
>
> (2)  To confer upon the governor and upon the mayors of the counties of the State the emergency powers necessary to prepare for and respond to emergencies or disasters;

(3)     To provide for the rendering of mutual aid among the counties of the State and with other states and in cooperation with the federal government with respect to the carrying out of emergency management functions;

(4)     To permit out-of-state utilities to provide services in the State pursuant to a mutual assistance agreement with a state utility to repair, renovate, or install electrical or natural gas facilities that have been damaged, impaired, or destroyed due to or in connection with such disasters or emergencies; and

(5)     To provide programs, in cooperation with other governmental agencies, the private sector, and nonprofit organizations, to educate and train the public to be prepared for emergencies and disasters.

(b)   It is further declared to be the purpose of this chapter and the policy of the State that all emergency management functions of this State and its counties be coordinated to the maximum extent with the comparable functions of the federal government, including its various departments, and agencies of other states and localities, and with private-sector and nonprofit organizations, to the end that the most effective preparation and use may be made of the nation's personnel, resources, and facilities for dealing with any emergency or disaster that may occur.

(c)   It is the intent of the legislature to provide for and confer comprehensive powers for the purposes stated herein.  This chapter shall be liberally construed to effectuate its purposes; provided that this chapter shall not be construed as conferring any power or permitting any action which is inconsistent with the Constitution and laws of the United States, but, in so construing this chapter, due consideration shall be given to the circumstances as they exist from time to time.  This chapter shall not be deemed to have been amended by any act hereafter enacted at the same or any other session of the legislature, unless this chapter is amended by express reference.

Notably, the stated purpose of the Emergency Management Act is "to protect the public health, safety, and welfare, and to preserve the lives and property of the people of the State."  HRS § 127A-1(a).  The means provided to effectuate that purpose include the authorization of emergency powers.  HRS § 127A-1(a)(2).  Of particular importance here, the Legislature affirmatively stated that:

> It is the intent of the legislature to provide for and confer comprehensive powers for the purposes stated herein. This chapter shall be liberally construed to effectuate its purposes[.]

HRS § 127A-1(c).

HRS § 127A-2 (Supp. 2019) defines emergency as "any occurrence, or imminent threat thereof, which results or may likely result in substantial injury or harm to the population or substantial damage to or loss of property."

Even in the absence of a declared state of emergency, HRS § 127A-12 (Supp. 2019) provides the Governor with wide-ranging powers pertaining to emergency management. The additional powers provided to the Governor by HRS § 127A-13(a) (Supp. 2019) during a declared state of emergency are extraordinary and potentially effect innumerable aspects of government functions, commercial activities, and the lives and property of the people of the State, as follows:

> **§ 127A-13  Additional powers in an emergency period.**
> (a)  In the event of a state of emergency declared by the governor pursuant to section 127A-14, the governor may exercise the following additional powers pertaining to emergency management during the emergency period:
>
> (1)  Provide for and require the quarantine or segregation of persons who are affected with or believed to have been exposed to any infectious, communicable, or other disease that is, in the governor's opinion, dangerous to the public health and safety, or persons who are the source of other contamination, in any case where, in the governor's opinion, the existing laws are not adequate to assure the public health and safety; provide for the care and treatment of the persons; supplement the provisions of sections 325-32 to 325-38 concerning compulsory immunization programs; provide for the isolation or closing of property which is a source of contamination or is in a dangerous condition in any case where, in the governor's opinion, the

existing laws are not adequate to assure the public health and safety, and designate as public nuisances acts, practices, conduct, or conditions that are dangerous to the public health or safety or to property; authorize that public nuisances be summarily abated and, if need be, that the property be destroyed, by any police officer or authorized person, or provide for the cleansing or repair of property, and if the cleansing or repair is to be at the expense of the owner, the procedure therefor shall follow as nearly as may be the provisions of section 322-2, which shall be applicable; and further, authorize without the permission of the owners or occupants, entry on private premises for any such purposes;

(2) Relieve hardships and inequities, or obstructions to the public health, safety, or welfare, found by the governor to exist in the laws and to result from the operation of federal programs or measures taken under this chapter, by suspending the laws, in whole or in part, or by alleviating the provisions of laws on such terms and conditions as the governor may impose, including licensing laws, quarantine laws, and laws relating to labels, grades, and standards;

(3) Suspend any law that impedes or tends to impede or be detrimental to the expeditious and efficient execution of, or to conflict with, emergency functions, including laws which by this chapter specifically are made applicable to emergency personnel;

(4) Suspend the provisions of any regulatory law prescribing the procedures for out-of-state utilities to conduct business in the State including any licensing laws applicable to out-of-state utilities or their respective employees, as well as any order, rule, or regulation of any state agency, if strict compliance with the provisions of any such law, order, rule, or regulation would in any way prevent, hinder, or delay necessary action of a state utility in coping with the emergency or disaster with assistance that may be provided under a mutual assistance agreement;

(5) In the event of disaster or emergency beyond local control, or an event which, in the opinion of the governor, is such as to make state operational control necessary, or upon request of the local entity, assume direct operational control over all or any part of the emergency management functions within the affected area;

(6) Shut off water mains, gas mains, electric power connections, or suspend other services, and, to

the extent permitted by or under federal law, suspend electronic media transmission;

(7)  Direct and control the mandatory evacuation of the civilian population;

(8)  Exercise additional emergency functions to the extent necessary to prevent hoarding, waste, or destruction of materials, supplies, commodities, accommodations, facilities, and services, to effectuate equitable distribution thereof, or to establish priorities therein as the public welfare may require; to investigate; and notwithstanding any other law to the contrary, to regulate or prohibit, by means of licensing, rationing, or otherwise, the storage, transportation, use, possession, maintenance, furnishing, sale, or distribution thereof, and any business or any transaction related thereto;

(9)  Suspend section 8-1, relating to state holidays, except the last paragraph relating to holidays declared by the president, which shall remain unaffected, and in the event of the suspension, the governor may establish state holidays by proclamation;

(10) Adjust the hours for voting to take into consideration the working hours of the voters during the emergency period, and suspend those provisions of section 11-131 that fix the hours for voting, and fix other hours by stating the same in the election proclamation or notice, as the case may be;

(11) Assure the continuity of service by critical infrastructure facilities, both publicly and privately owned, by regulating or, if necessary to the continuation of the service thereof, by taking over and operating the same; and

(12) Except as provided in section 134-7.2, whenever in the governor's opinion, the laws of the State do not adequately provide for the common defense, public health, safety, and welfare, investigate, regulate, or prohibit the storage, transportation, use, possession, maintenance, furnishing, sale, or distribution of, as well as any transaction related to, explosives, firearms, and ammunition, inflammable materials and other objects, implements, substances, businesses, or services of a hazardous or dangerous character, or particularly capable of misuse, or obstructive of or tending to obstruct law enforcement, emergency management, or military operations, including intoxicating liquor and the liquor business; and authorize the seizure and forfeiture of any such objects,

implements, or substances unlawfully possessed, as provided in this chapter.[4]

HRS § 127A-21 (Supp. 2019) specifically authorizes the Governor to "requisition and take over any materials, facilities, or real property or improvements," during the pendency of an emergency proclamation, subject to fair and just compensation and damages.  See also HRS § 127A-22 (Supp. 2019) (regarding determination of compensation); and HRS § 127A-23 (Supp. 2019) (regarding determination of damages).  HRS § 127A-25 (Supp. 2019) provides the Governor rule-making authority not subject to HRS chapter 91.  The Emergency Management Act also includes provisions for the enforcement of any rule issued under the Act and punishment including not more than one year of imprisonment and/or a fine of not more than $5,000 for violation of any such rule.  See HRS § 127A-28 (Supp. 2019) (regarding injunctions); HRS § 127A-29 (Supp. 2019) (regarding misdemeanor penalties for violations).  HRS § 127A-30 (Supp 2019) prohibits, *inter alia*, most price increases for any commodities, such as food, water, fuel, and other merchandise.

With the stated purposes and policy goals of the Emergency Management Act in mind, and in light of the sweeping scope of its provisions, we return to HRS § 127A-14.  Subsection

---

[4]    No issue concerning the constitutionality of these powers (or any other part of the Emergency Management Act), either on the face of the statute or as applied in the context of Governor Ige's Covid-19 emergency proclamations, is before the court in this appeal.

(a) of HRS § 127A-14 directly authorizes the Governor's declaration of a state of emergency and simply states:

> The governor may declare the existence of a state of emergency in the State by proclamation if the governor finds that an emergency or disaster has occurred or that there is imminent danger or threat of an emergency or disaster in any portion of the State.

The only condition or limitation in HRS § 127A-14(a) to the Governor's authority to issue an emergency is a finding by the Governor that "an emergency or disaster has occurred or that there is imminent danger or threat of an emergency or disaster in any portion of the [State]."  Subsection (c) of HRS § 127A-14 provides that the Governor "shall be the sole judge of the existence of the danger, threat, or circumstances giving rise to a declaration of a state of emergency in the State[.]"  As discussed above, subsection (d) of HRS § 127A-14 provides for the automatic termination of any state of emergency 60 days after the issuance of a proclamation of a state of emergency (unless terminated sooner), but does not expressly preclude the Governor from issuing more than one emergency proclamation based on the same emergency.

Read together with HRS § 127A-14(c) & (d), and in light of the Emergency Management Act as a whole, we hold that HRS § 127A-14(a) authorizes the Governor to declare the existence of a state of emergency *whenever*, in his or her sole judgment, he or she finds that circumstances giving rise to a declaration of a state of emergency have occurred (or that there is imminent

19

danger or threat of an emergency), regardless of whether a prior emergency proclamation has been issued based on the same, continuing, and/or otherwise related circumstances. This statutory authority, in essence, requires an independent finding by the Governor that such circumstances exist each time a proclamation is issued; in other words, the statute does not permit the Governor to "extend" a prior state of emergency in contravention of the automatic termination provision in HRS § 127A-14(a). That said, there is no requirement that the Governor's finding state that new circumstances giving rise to a declaration of a state of emergency have occurred.

We recognize the breadth and gravity of this statutory interpretation. However, we have reviewed the legislative history of the Emergency Management Act and found nothing inconsistent with or casting doubt on our reading of the Act. At oral argument, Appellants acknowledged that nothing in the legislative history supports an alternative conclusion.

Instead, Appellants urged us to follow the Wisconsin Supreme Court's interpretation of that state's emergency powers act to require legislative action to extend a state of emergency beyond 60 days. However, the Wisconsin court's determination was based primarily on the plain language of the Wisconsin statute, which specifies that "[a] state of emergency shall not exceed 60 days, unless the state of emergency is extended by joint resolution of the legislature." See Fabick v. Evers, 956 N.W.2d

856, 862 (Wis. 2021) (quoting Wis. Stat. § 323.10 (West 2019-20)). The Wisconsin Supreme Court reasoned that the plain language of the statute enabled the governor to issue an emergency order for up to 60 days, but "the legislature reserves for itself the power to determine the policies that govern the state's response to an ongoing problem." Fabick, 956 N.W.2d at 865. Hawaii's Emergency Management Act, as currently enacted, contains no such reservation.

Appellants similarly point to the Michigan Supreme Court's opinion in In re Certified Questions From the United States District Court, Western District of Michigan, Southern Division v. Governor of Michigan, 958 N.W.2d 1 (Mich. 2020). However, as the Michigan court recognized, Michigan's emergency powers statute specifically provides that "[a]fter 28 days, the governor shall issue an executive order or proclamation declaring the state of emergency terminated, unless a request by the governor for an extension of the state of emergency for a specific number of days is approved by resolution of both houses of the legislature." Id. at 9 (quoting Mich. Comp. Law. Ann. § 30.403 (West 2019-20)). Thus, the Michigan statute, like the Wisconsin statute and unlike the Hawaiʻi statute, expressly requires legislative action to authorize a state of emergency beyond the initial statutory period.

Finally, Appellants argue, in various ways, that our interpretation of the Emergency Management Act would produce an

absurd result because it would grant the Governor essentially limitless and endless powers to rule the State by emergency proclamation, unchecked by legislative or judicial restraints. See, e.g., State v. Shaw, 150 Hawaiʻi 56, 61, 497 P.3d 71, 76 (2021) ("[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality") (citation omitted). We reject this argument in large part because the Emergency Management Act itself contemplates judicial review. HRS § 127A-27 (Supp. 2019) provides in part:

> **§ 127A-27 Preliminary or interlocutory injunctions and temporary restraining orders**. Notwithstanding any other law to the contrary, no preliminary or interlocutory injunction, or temporary restraining order, suspending, enjoining, or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, on the ground of unconstitutionality or for any other reason or reasons, any provision of this chapter or any proclamation, order, or rule prescribed, made, or issued under the authority of this chapter, shall be issued or granted by any court of the State, or by any judge thereof, unless the application for the same is presented to a circuit judge, is heard and determined by the circuit judge sitting with two other circuit judges, and a majority of the judges concur in granting the application. . . .

In addition, we take judicial notice that the Hawaiʻi Legislature has conducted multiple regular and special sessions since Governor Ige's issuance of the numerous Covid-19-related emergency proclamations that followed the Initial Proclamation and thus, the Legislature has had multiple opportunities to amend the Emergency Management Act to expressly limit the Governor's use of emergency powers (or otherwise) or to promulgate resolutions regarding the subject. See generally State v. Hussein, 122 Hawaiʻi 495, 529, 229 P.3d 313, 347 (2010)

(legislative inaction may indicate tacit approval of statutory interpretation). While we decline to necessarily read tacit endorsement or approval into legislative inaction, here, the Legislature passed Act 57 in 2021, which specifically referred to the Governor's Initial Proclamation and supplemental proclamations. 2021 Haw. Sess. Laws Act 57, § 1 at 181. Thus, the Legislature has demonstrated its ability to act in response to the Governor's proclamations, whether in furtherance or support of the Governor's actions, as in the case of Act 57, or in order to limit or otherwise modify the Governor's emergency powers.

For these reasons, we conclude that the Circuit Court did not err in rejecting Appellants' argument that HRS chapter 127A limits the Governor's exercise of emergency powers under the Act to a single, 60-day period.

B.   The Dismissal Order

Appellants contend that the Circuit Court erred in the Dismissal Order when the court adopted Appellees' arguments, without identifying the precise issues being decided and without sufficiently elaborating on its reasoning or citing the authorities relied on by the court. We conclude that this argument is without merit. The Dismissal Order includes sufficient detail to allow this court to review the Circuit Court's ruling. The Circuit Court expressly rejected Appellants' argument that HRS chapter 127A supported its first claim and

stated that Appellants' claim in regards to the vagueness of prior emergency proclamations, *i.e.*, their second claim, was moot. Appellants cite no authority supporting their contention that the Circuit Court should be vacated on this ground and we find none. See generally DL v. CL, 146 Hawaiʻi 328, 339-40, 463 P.3d 985, 996-97 (2020) (discussing the sufficiency of a family court order).

C. Mootness

The Circuit Court granted Appellees' request to dismiss Count II of the Complaint based on Appellees' argument that the Complaint sought to challenge proclamations that were superseded and no longer in effect, stating:

> Plaintiffs' claim in regards to the vagueness of prior emergency proclamations, which are no longer in effect, is deemed moot and is dismissed with prejudice.

On appeal, For Our Rights contends that no issues before the court are moot.[5]

It is well-settled that:

> A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper - and properly limited - role of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

---

[5] As the Circuit Court's dismissal of Count II was based on mootness and the court did not reach any other issue, our review is limited to whether Appellants' claim was moot.

Kahoʻohanohano v. State, 114 Hawaiʻi 302, 332, 162 P.3d 696, 726 (2007) (emphasis omitted) (quoting Kona Old Hawaiian Trails Group v. Lyman, 69 Haw. 81, 87, 734 P.2d 161, 165 (1987)).

However, Hawaiʻi courts recognize certain exceptions to the mootness doctrine, including:  (1) the "capable of repetition, yet evading review" exception; and (2) the public interest exception.  Hamilton, 119 Hawaiʻi at 5, 193 P.3d at 843. We conclude that both of these exceptions apply in this case.

Hawaiʻi courts recognize that:

> The phrase, 'capable of repetition, yet evading review,' means that 'a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit.'

Hamilton, 119 Hawaiʻi at 5, 193 P.3d at 843 (citation omitted). Here, any challenge of a governor's exercise of emergency powers under HRS chapter 127A would necessarily evade full judicial review because any given proclamation of a state of emergency automatically terminates sixty days after the issuance of such proclamation, if not sooner.

In determining whether the public interest exception to the mootness doctrine applies, Hawaiʻi courts consider "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question."  Doe v. Doe, 116 Hawaiʻi 323, 327, 172 P.3d 1067, 1071 (2007) (citations and internal quotation

marks omitted); see also Yoshimura v. Kaneshiro, 149 Hawaiʻi 21, 35, 481 P.3d 28, 42 (2021). Here, we conclude that the questions presented are clearly of a public nature, as the expansive powers granted to the Governor under the Emergency Management Act can be applied, with few exceptions, to virtually everyone in the State, whether resident or visitor, as well as all government and private enterprises and public and private properties. An authoritative determination of whether HRS chapter 127A, as currently enacted, limits the Governor's emergency powers to a single period of no more than 60 days and whether, *inter alia*, the mandates, restrictions, and criminal penalties imposed in Governor Ige's proclamations would be desirable, as the same or similar mandates, restrictions, and criminal penalties remain in place as of this Opinion or could be imposed in future emergency proclamations. With respect to the third prong of this test, the mandates, restrictions, and criminal penalties have in fact reoccurred since the proclamations that were specifically challenged in the Complaint and it seems likely that similar measures might be taken in the future in the face of an emergency or disaster in light of language of the Act, as well as its application in response to the Covid-19 pandemic.

Accordingly, we conclude that the Circuit Court erred in dismissing the Complaint in part on the grounds of mootness.[6]

---

[6] Although not the basis for our decision, for the purpose of clarity, we note in dictum that the Circuit Court plainly erred in dismissing
(continued...)

Appellants argue the Circuit Court erred by "tacitly adopting" Appellees' argument that Appellants lack standing, which stems principally from the argument that Appellants' claims are moot. However, upon review, we conclude that the Circuit Court did not determine that Appellants lack standing. Accordingly, we need not address the issue here.

V. CONCLUSION

For these reasons, the Circuit Court's December 23, 2020 Judgment is affirmed in part and vacated in part; the dismissal of Count I of the Complaint is affirmed, and the dismissal of Count II of the Complaint is vacated. This case is remanded to the Circuit Court for further proceedings consistent with this Opinion.

On the briefs:

Marc J. Victor,
Jody L. Broaddus,
for Plaintiffs-Appellants.

Nicholas M. McLean,
Ewan C. Rayner,
David D. Day,
Craig Y. Iha,
Deputy Attorneys General,
for Defendants-Appellees.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Sonja M.P. McCullen
Associate Judge

---

[6](...continued)
a claim *with prejudice* based on that claim being moot. A dismissal for mootness is a dismissal for lack of jurisdiction. See Hamilton, 119 Hawaiʿi at 5-6, 193 P.3d at 843-44. A dismissal for lack of jurisdiction is not a dismissal on the merits. See Smallwood v. City & Cty. of Honolulu, 118 Hawaiʿi 139, 154, 185 P.3d 887, 902 (App. 2008). Dismissal for lack of subject matter jurisdiction should be without prejudice, as a court is unable to reach the merits of claims over which it has no subject matter jurisdiction. See, e.g., Target Training Int'l, Ltd. v. Extended Disc N. Am., Inc., 645 F. App'x 1018, 1025 (Fed. Cir. 2016); Topper v. Progressive Cty. Mut. Ins. Co., 598 F. App'x 299, 300 (5th Cir. 2015).

CONCURRING IN PART

With regard to Count 1, I concur in the result only.

/s/ Karen T. Nakasone
Associate Judge