*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCAP-24-0000401
11-SEP-2025
12:34 PM
Dkt. 36 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

LEONARD K. NAKOA III, DANIEL PALAKIKO, TOM COFFMAN, LLEWELYN
(BILLY) KAOHELAULIʻI, VAL TURALDE, ELIZABETH OKINAKA, TOM KEALIʻI
KANAHELE, RUPERT ROWE, ELLEN EBATA, and JEFFREY LINDNER,
Plaintiffs-Appellants,

vs.

GOVERNOR OF THE STATE OF HAWAIʻI, HAWAIʻI HOUSING FINANCE AND
DEVELOPMENT CORPORATION, State of Hawaiʻi,
Defendants-Appellees.

SCAP-24-0000401

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CAAP-24-0000401; CASE NO. 2CSP-23-0000046)

SEPTEMBER 11, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY EDDINS, J.

This case concerns the scope of a governor's executive

powers under Hawaiʻi's emergency management statute, Hawaiʻi

Revised Statutes (HRS) chapter 127A.  Plaintiffs challenge a

series of emergency proclamations relating to affordable housing

issued by Governor Josh Green suspending various state law provisions and establishing emergency rules to expedite affordable housing project approval and construction. Since issuing the first proclamation in 2023, the governor has renewed the proclamations every sixty days. The most recent version of the affordable housing proclamation (the Fifteenth Proclamation) remains in effect today.

This case's procedural posture presents several issues. We hold that the case is justiciable, Plaintiffs have standing, and Plaintiffs' failure to strictly follow procedural requirements does not bar their suit. So we reach the merits.

We hold that a reviewing court will not disturb an emergency proclamation when (1) the emergency proclamation is rationally related to the health, safety, and welfare of the public, and (2) the executive action taken under the proclamation is reasonably necessary to address the emergency.

Applying this standard, the Sixth through Fifteenth proclamations are valid. These proclamations are rationally related to the health, safety, and welfare of the public, and the executive action taken under the proclamations are reasonably necessary to address the emergency situation. See HRS §§ 127A-1 (Supp. 2022); 127A-14(a) (Supp. 2019); Amdor v. Grisham, No. S-1-SC-40105, 2025 WL 718840, at \*15-16 (N.M. Mar.

6, 2025); Worthington v. Fauver, 440 A.2d 1128, 1135 (N.J. 1982).

In contrast, the first five emergency proclamations' measures addressing affordable housing exceed the governor's emergency powers. Those proclamations were rationally related to the health, safety, and welfare of the public. But the executive action taken was not reasonably necessary to address the declared emergency. The early proclamations opened project certification to all housing projects, not just affordable housing. Those actions exceeded the governor's HRS chapter 127A emergency powers.

I.

**A. The Proclamations**

On July 17, 2023, Governor Josh Green issued a Proclamation Relating to Housing (First Proclamation), the first in a series of sixty-day emergency proclamations regarding affordable housing.

The proclamations, issued pursuant to HRS chapter 127A, declared affordable housing a state emergency, and suspended various state laws to expedite affordable housing approval and construction. These sixty-day proclamations were issued consecutively. This series of proclamations includes the governor's July 2023 Proclamation Relating to Housing (First Proclamation), September 2023 Proclamation Relating to

Affordable Housing (Second Proclamation), and the Second Proclamation Relating to Affordable Housing (Third Proclamation) through the Fourteenth Proclamation Relating to Affordable Housing (Fifteenth Proclamation).  The most recent proclamation, the Fifteenth Proclamation, expires on September 26, 2025.

The First Proclamation declared that "the severe shortfall of affordable housing had been recognized as early as 1935, when the Territory of Hawai'i passed Act 190, Session Laws of Hawai'i 1935, creating the Hawai'i Housing Authority."  This shortfall "has never been adequately addressed, contributing to a 1,200% increase in home prices over the last 45 years."  Thus, there is a "housing crisis" impacting, among other things, health, and the emigration-related loss of talented or essential workers, and Native Hawaiian residents.  The First Proclamation also stated that it addressed "the need for an immediate and profound solution to Hawai'i's housing shortage" and that "urgent action is needed to combat" decreasing population, and adverse social, economic, and health outcomes in the state.

The First Proclamation announced, "the current threat to the health, safety, and welfare of the people of the State of Hawai'i caused by the lack of affordable housing constitutes an emergency under [HRS § 127A-14], and warrants preemptive and protective actions."

The First Proclamation established a State Lead Housing Officer (SLHO) position and the Build Beyond Barriers Working Group (Working Group).  The Working Group was tasked with overseeing a project certification application process.  Certified projects were not subject to state or county laws suspended under the proclamation.

The proclamation suspended twenty-two HRS chapters and statutory provisions.  Relevant to Plaintiffs' appeal, it suspended HRS chapter 6E (historic preservation), HRS chapter 103D (the procurement code, in relation to solicitation), HRS chapter 46 (general provisions related to county organization, including zoning), HRS chapter 76 (civil service), HRS chapter 343 (environmental impact statements), HRS § 201H-38 (2017) (housing exemptions), and HRS § 205-3.1(a) (2017) and § 205-4(a) (2017 & Supp. 2021) (Land Use Commission district boundary amendment provisions).

The proclamation issued rules to guide its suspension of laws.  Citing HRS § 127A-25 (Supp. 2014), the proclamation established "Rules Relating to Project Certification Pursuant to the Governor's Emergency Proclamation Relating to Housing" (Project Certification Rules) that defined terms, and described the Working Group's state and non-state entity membership, the certification application process, project eligibility, development agreements, and project prioritization.  Section 9

of the rules detailed the "application of suspended laws" for HRS chapters 6E, 46, 76, 103D, 343, and HRS §§ 205-3.1(a), 205-4, and 201H-38(a).

On September 15, 2023, the governor issued his Proclamation Relating to Affordable Housing (Second Proclamation). The proclamation removed the SLHO position and directed the Director of the Office of Planning and Sustainable Development, Executive Director of the Hawai'i Public Housing Authority (HPHA), and the Hawai'i Housing Finance and Development Corporation (HHFDC) Executive Director to carry out the proclamation.

The governor later abolished the Build Beyond Barriers Working Group in his Sixth Proclamation issued in February 2024. He directed the HHFDC "to take appropriate action to support and carry out the intent and purposes of this Proclamation."

The Plaintiffs' case filings cover the first six proclamations related to affordable housing. To date, the governor has issued fifteen emergency proclamations. See Off. of the Governor, Fourteenth Proclamation Relating to Affordable Housing, accessible at https://governor.hawaii.gov/wp-content/uploads/2025/07/2507086-ATG_Fourteenth-Proclamation-Relating-to-Affordable-Housing.pdf [https://perma.cc/JT34-N5GS]. Because all emergency proclamations in this series are based on the same declared emergency, this opinion assesses all proclamations issued as of the date of this case's judgment. We

take judicial notice of all emergency proclamations issued after this case began.

**B.    Plaintiffs' Claims**

A month after the First Proclamation issued, in August 2023, Plaintiffs filed a Petition for Writ of Quo Warranto against the State Lead Housing Officer and the Build Beyond Barriers Working Group.  Later they filed a first amended petition.

Plaintiffs are from Kauaʻi, Oʻahu, and Maui.  Some plaintiffs are "descendent[s] of the aboriginal people who inhabited the Hawaiian Islands prior to 1778."  Plaintiffs say they "want to be able to testify on matters concerning fast-tracked affordable housing projects" before their respective county councils.  They are also "concerned about fairness in government expenditures, including that prospective bidders and offerors act in good faith in the public procurement process."

First, Plaintiffs alleged that the First Proclamation violated HRS chapter 127A.  Plaintiffs claimed that "[l]ack of affordable housing is not an 'occurrence, or imminent threat thereof' and therefore cannot constitute an emergency" under HRS § 127A-2.  Because the Proclamation "lack[ed] a lawful basis to declare a state of emergency[] . . . . [t]he establishment of the SLHO and the Working Group" sidestepped the law.  Plaintiffs also believed that the Proclamation violated article I, § 15 of

7

the Hawai'i Constitution (habeas corpus and suspension of laws).

Second, Plaintiffs alleged that the Proclamation exceeded the governor's HRS chapter 127A authority.  Because HRS chapter 127A does not authorize amendment or modification of state or county laws, the Proclamation and Project Certification Rules' "alternative processes" (allowing the SLHO and the Working Group to certify projects) "exceed[ed] the emergency management authority delegated by statute."  Plaintiffs said that the "alternative processes" are void and unlawful.  They also claimed that the amendments and modifications of state or county laws violated the separation of powers, and article I, section 15 of the Hawai'i Constitution.

## C.    The State's Motion to Dismiss

The State moved to dismiss Plaintiffs' petition.

The State offered several arguments.  First, the State argued that claims against the SLHO and the Working Group lacked merit because the writ of quo warranto mechanism under HRS § 659-1 (2016) cannot be used to challenge the validity of the SLHO and the Working Group.  Second, because the SLHO had already resigned, the claims against the SLHO were moot and no mootness exception applied.  Third, the State argued that the governor, as the "sole judge" of the existence of a state of emergency, lawfully issued an emergency declaration.  Last, the State maintained that the proclamations violated neither the

separation of powers, nor article I, section 15 of the Hawai'i Constitution.

Circuit Court of the Second Circuit Judge Peter T. Cahill granted the State's motion without prejudice. The court ruled that "the mechanism employed by [Plaintiffs] is inapplicable at this point in the case. [Plaintiffs'] assertions are moot, that although they may be repeated, they will not necessarily evade review and, in fact, they can be reviewed." The court also rejected Plaintiffs' claims that the governor lacked a lawful basis to issue the emergency proclamations. Relying on the Intermediate Court of Appeals' (ICA) decision in For Our Rights v. Ige, 151 Hawai'i 1, 507 P.3d 531 (App. 2022), it reasoned that "the Governor does have the power to issue any emergency proclamation that he has been authorized to do so under the statute for addressing any imminent danger or power." The court, though, acknowledged that "[Plaintiffs] are correct in both questioning the interpretation of 'imminent danger,' and expressing concerns over the opportunity for recurrence."

In the end, the circuit court determined this was an emergency powers case. "[T]he focus should be then on the Governor's constitutional authority instead of the SHLO and the Working Group." The court commented that Plaintiffs, if they so chose, could amend their petition to direct their constitutional authority claims towards the governor, not the [SLHO] and

Working Group. It reasoned that the "mechanism [Plaintiffs] employ[ed]" – the quo warranto petition – was inapplicable at this point in the case. Then the court sensibly ruled. To "eliminate yet another lawsuit being filed, [and] somebody else having to review all of the same issues," the court dismissed the petition without prejudice and gave Plaintiffs until February 16, 2024 to amend their quo warranto petition.

On March 19, 2024, Plaintiffs filed an amended complaint, this time against the governor and HHFDC. Plaintiffs' declaratory relief complaint was nearly identical to their quo warranto petition. The amended complaint alleged the same counts, minus reference to the SLHO, Working Group, and former defendants' lack of authority to hold office. While the quo warranto petition sought both ouster from office and declaratory relief, the amended complaint solely sought declaratory relief.

The State filed a second motion to dismiss. The State argued that Plaintiffs lacked standing to pursue HRS § 632-1 (2016) relief because they did not allege concrete interests impacted by a legal right or privilege. The State also argued that Plaintiffs did not take the proper procedural path for injunctive relief. Per HRS § 127A-27 (Supp. 2014), a three-judge panel appointed by the Chief Justice of the Hawai'i Supreme Court hears challenges to the executive branch's use of emergency powers. Thus, Plaintiffs were barred from seeking HRS

§ 632-1 declaratory relief before a single circuit court judge, the State maintained.

Plaintiffs countered that they had standing to challenge the proclamations. They said that the proclamations infringed on concrete interests, including their interest in protecting their constitutional rights. Plaintiffs argued that they have constitutional rights to a clean and healthful environment "as defined by laws relating to environmental quality - HRS §§ 46-4, 201H-38, and 205." Suspension of HRS § 201H-38, Plaintiffs believed, impacts HRS chapter 205, a law related to environmental quality. This HRS § 201H-38 suspension, Plaintiffs argued, also impacts county council zoning powers under HRS § 46-4 (Supp. 2017), implicating the environment and Plaintiffs' constitutional right to a clean and healthful environment. Plaintiffs further claimed concrete interests in their First Amendment free speech rights, and their taxpayer statuses.

On June 3, 2024, the circuit court granted the State's motion to dismiss and denied Plaintiffs' motion for summary judgment.

**D.   Appeal and transfer to this court**

Plaintiffs appealed. After both parties completed ICA briefing, Plaintiffs requested transfer to this court per HRS § 602-58 (2016).

11

Plaintiffs argue that the circuit court erred in dismissing their constitutional limitation challenges regarding suspension and "rewriting" of laws, and dismissing their quo warranto petition and declaratory relief complaint based on mootness.

This court accepted transfer.

We vacate the circuit court's decision to dismiss Plaintiffs' declaratory judgment claims. We decline to address whether the circuit court erred in denying Plaintiffs' quo warranto claims.

First, we tackle the State's procedural arguments. Mootness, standing, and HRS § 127A-27 requirements do not bar Plaintiffs' action.

The circuit court erred in holding that Plaintiffs' claims were moot. Plaintiffs met all factors under the public interest exception to mootness. See Kaho'ohanohano v. State, 114 Hawai'i 302, 333, 162 P.3d 696, 727 (2007). The public has an interest in judicial clarification of the scope of statewide, serial emergency proclamations issued to address affordable housing. See id. The same interest exists for the validity of the suspension of laws related to public procurement, environmental and historic properties protection, and county zoning. See id.; Office of Hawaiian Affairs v. Kondo, 153 Hawai'i 170, 177, 528 P.3d 243, 250 (2023). This case "offers a chance to guide public officers," and the issues raised in this case are "apt to

resurface."  See id.

Next, Plaintiffs have standing to bring their claims under HRS § 632-1.  We hold that in this particular case, HRS § 46-4 is a law relating to environmental quality to the extent that its suspension impacts Plaintiffs' constitutional right to a clean and healthful environment under article XI, section 9 of the Hawai'i Constitution.  See Tax Foundation of Hawai'i v. State, 144 Hawai'i 175, 189, 439 P.3d 127, 141 (2019); County of Hawai'i v. Ala Loop Homeowners, 123 Hawai'i 391, 409-10, 235 P.3d 1103, 1121-22 (2010).

As to the State's position that Plaintiffs' action started in the wrong place because they overlooked HRS § 127A-27's three-judge panel process, we agree with the State.  HRS § 127A-27 is the proper path to challenge emergency proclamations.  Bypassing the three-judge panel, though, is not fatal to Plaintiffs' case under the circumstances.  Plaintiffs' decision to file a declaratory judgment action does not foreclose their claims.  They reasonably relied on For Our Rights v. Ige, where the ICA examined the merits of a COVID-19 proclamations challenge without dismissing the case for failure to follow HRS § 127A-27's procedure.  151 Hawai'i at 4, 11, 507 P.3d at 534, 541 (cert rejected).

Because our opinion guides future suits under HRS chapter 127A, we reach the merits.  Judicial review standards are needed

13

to aid courts appraising emergency proclamations.

First, we address the parties' points regarding the definition of "emergency." We hold that a narrow reading unduly constrains the legislature's intent to centralize executive powers and promote agility during an emergency. Long-standing issues that escalate or reach crisis-levels may constitute an "emergency." Under these circumstances, the executive branch has discretion to act in the best interest of public health, safety, and welfare.

Second, we address judicial review of a governor's emergency proclamations under the statute. HRS § 127A-14's command that the governor "shall be the sole judge of the existence of the danger, threat, or circumstances giving rise to a declaration[] . . . of a state of emergency in the State" does not, as the State seemingly suggests, abrogate judicial review of whether the governor complied with the statute in issuing an emergency proclamation. This court may review whether a governor acts within their authority to declare an emergency under HRS chapter 127A.

Third, we articulate a standard for judicial review of emergency proclamations under HRS chapter 127A. We conclude that the governor properly exercised his emergency authority in proclamations Six through Fifteen. These emergency proclamations were rationally related to the health, safety, and

14

welfare of the public, and the executive action taken under the proclamations were reasonably necessary to address the emergency situation.  See HRS §§ 127A-1; 127A-14(a); Worthington, 440 A.2d at 1135.

The standard for reviewing emergency declarations applies prospectively.  The certification process has operated thus far in reliance on its validity.  So, while we do not void the First through Fifth Proclamations, we hold that the first five proclamations exceeded the scope of the emergency management statute.  The proclamations were all rationally related to the health, safety, and welfare of the public.  But the proclamations' Build Beyond Barriers Working Group and over-inclusive certification process, absent further limitations tailored to the development of affordable housing, was not reasonably necessary to address the declared emergency.

We also stress that the First Proclamation - by suspending numerous chapters of the Hawai'i Revised Statutes and enacting accompanying rules that consolidated significant decision-making with SLHO - was not reasonably necessary to address the declared emergency.  Again, because our opinion is prospective, we review this proclamation to aid the executive branch and litigants, and to guide courts assessing emergency proclamations in the future.

Last, we hold that the proclamations did not violate the separation of powers.  The governor's interpretation of the

15

statute does not invade the province of the legislature. See Casey v. Lamont, 258 A.3d 647, 663-66 (Conn. 2021). The legislature also did not unconstitutionally delegate to the governor the authority to suspend laws and make rules to carry out the emergency management statute in HRS § 127A-13(3) (Supp. 2019) and HRS § 127A-25.

We vacate the court's procedurally-related dismissal of Plaintiffs' claims.

We hold that the Sixth through Fifteenth affordable housing proclamations were rationally related to public health, safety, and welfare, and the actions taken under the proclamation were reasonably necessary.

To start, we discuss justiciability.

**II.**

**A.    The circuit court erred in holding that Plaintiffs' claims were moot**

The public interest exception to mootness applies to Plaintiffs' claims.

"[W]hen the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot." Kaho'ohanohano, 114 Hawai'i at 333, 162 P.3d at 727. The "public interest" exception to mootness examines the following criteria: "(1) the public or private nature of the question presented, (2)

the desirability of an authoritative determination for the future guidance of public officers, and (3) the likelihood of future recurrence of the question."  Id. (cleaned up).

Plaintiffs' claims satisfy these criteria.

First, the public has an interest in resolution of the issues raised by Plaintiffs.  See id.; Kondo, 153 Hawaiʻi at 177, 528 P.3d at 250.  Plaintiffs argue that this suit raises "concern[s] [regarding] the proper procedures, order, and implementation of governmental authority over a range of statutory subjects, including transparency in public procurement, environmental and historic properties protection, and contributions to public schools."  Plaintiffs' suit also raises unique questions regarding the scope of the governor's powers to declare emergency proclamations, and what types of purported "disasters" or "emergencies" warrant executive action. These statewide issues have public interest.  See Carmichael v. Bd. of Land & Nat. Res., 150 Hawaiʻi 547, 561, 506 P.3d 211, 225 (2022) (issues are "public" if they implicate "political and legislative issues that affect a significant number of Hawaiʻi residents").

Because emergency proclamations terminate automatically after sixty days, and then must be replaced by a new proclamation to continue the state of emergency, these proclamations are difficult to challenge.  See HRS § 127A-14(d).

17

Given the burden to challenge this type of executive action, we also consider the adjudication of these issues important to the broader public.

In recent years, emergency proclamations have increasingly affected many areas of public policy. During his tenure, the governor has issued statewide, ongoing, serial emergency proclamations on issues ranging from axis deer (a holdover from the prior administration) and dilapidated hotels, to school bus services. See Office of the Governor David Y. Ige, Governor Ige Extends Emergency Disaster Relief for Maui Axis Deer Crisis Into January (Nov. 18, 2022), https://hdoa.hawaii.gov/blog/main/axisdeer5thproc/ [https://perma.cc/2WG6-VWGY]; Office of the Governor, Nineteenth Proclamation Relating to Axis Deer, accessible at https://governor.hawaii.gov/wp-content/uploads/2025/02/2502091_Nineteenth-Proclamation-Relating-to-Axis-Deer.pdf [https://perma.cc/B5GY-DWJU]; Office of the Governor, Thirteenth Proclamation Relating to Uncle Billy's Hilo Bay Hotel, accessible at https://governor.hawaii.gov/wp-content/uploads/2025/06/2506001_ATG-Thirteenth-Proclamation-Relating-to-Uncle-Billys-Hilo-Bay-Hotel.pdf [https://perma.cc/FY8W-93RW]; Office of the Governor, Fifth Proclamation Relating to School Bus Services, accessible at

https://governor.hawaii.gov/wp-content/uploads/2025/03/2503083_Fifth-Proclamation-Relating-to-School-Bus-Services.pdf [https://perma.cc/4JFG-VHVW].

While this case confines our review to the affordable housing proclamations, governors' recent reliance on the emergency proclamation mechanism (and future governors' potential use of this mechanism) for issues not typically considered traditional "emergencies" is of a public nature.

Clarifying the application of governance statutes also serves a public interest. Kondo held that the public had an interest in resolving the dispute between the Office of the Auditor and the Office of Hawaiian Affairs – "two constitutionally created state government agencies." 153 Hawai'i at 177, 528 P.3d at 250. We also reasoned that "interpretation of major statutes" holds public importance. Id.

Here, the interpretation of the governor's powers under HRS chapter 127A has public importance because it involves the use of these extraordinary powers. See id. The public has an interest in the interpretation of this statute because the governor and county mayors may continue to issue proclamations on any number of issues. (For purposes of this opinion, reference to the governor's powers also refers to county mayors' equivalent powers.) The public has an interest in a declaratory judgment as to whether the governor may issue emergency

19

proclamations for allegedly non-imminent issues, and engage in rulemaking related to the suspension of laws based on those proclamations.

Second, this case "offers a chance to guide public officers." See id. Kondo clarified "how the Office of the Auditor and an auditee tread when disclosure of privileged communications is at stake." Id. This case allows us to establish judicial review standards for emergency proclamations under the emergency management statute. See id.

Third, the issues raised in this case are "apt to resurface." Id. The initial circuit court proceedings only involved the First and Second Proclamations. By the time the Plaintiffs filed their amended complaint (after the second circuit court dismissal), the Governor had issued his Fifth Proclamation. Since then, the Governor has issued ten more proclamations. The current proclamation (the Fifteenth) expires on September 26, 2025. See Off. of the Governor, Fourteenth Proclamation Relating to Affordable Housing. This issue – whether affordable housing under these proclamations constitute an "emergency" or "disaster" - is thus likely to recur in another sixty-day proclamation.

Because Plaintiffs' claims fall within the public interest exception to mootness, they were not moot.

B.    **Plaintiffs have standing under HRS § 632-1 because they have a "concrete interest" in the right to a clean and healthful environment**

Plaintiffs have standing under HRS § 632-1 if they have a "concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party." Tax Foundation, 144 Hawai'i at 189, 439 P.3d at 141 (citing HRS § 632-1(b)).

The executive's use of emergency powers is by nature uncommon and extraordinary.  This case's questions regarding the bounds of legislatively-conferred emergency powers are of great public interest and judicial importance.  This weighty subject matter - paired with our case law interpreting the constitutional right to a clean and healthful environment - grounds Plaintiffs' HRS § 632-1 concrete interest, and in turn, standing.  See Haw. Const. art. XI, § 9.

The proclamations suspend HRS § 46-4.  This consequential use of executive authority to sideline the law governing the county zoning framework leads us to hold that HRS § 46-4 is a law relating to environmental quality that has impacted Plaintiffs' right to a clean and healthful environment.  Haw. Const. art. XI, § 9.  Plaintiffs have standing under HRS § 632-1.  See Tax Foundation, 144 Hawai'i at 189, 439 P.3d at 141.

We decline, though, to hold that Plaintiffs have a concrete interest in their First Amendment rights to testify at county

21

council meetings about HRS § 201H-38 affordable housing project approvals. Plaintiffs seem to conflate the First Amendment right to free speech with the procedural due process opportunity to be heard. See Haw. Const. art. I, § 4, § 5. The suspension of the county approval requirement for HHFDC affordable housing projects does not violate a putative right to testify before the county council or the HHFDC. We also hold that there is no taxpayer standing. See Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 282, 768 P.2d 1293, 1298 (1989).

Plaintiffs must have a stake in the controversy. Standing supports our constitutional structure. Legislative policy and constitutional purposes inform standing. Here, legislative policy declarations framing the right to a clean and healthful environment guide our standing analysis.

This court "believe[s] [the] judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context." Life of the Land v. Land Use Comm'n of State of Haw., 63 Haw. 166, 171-72, 623 P.2d 431, 438 (1981). But our prudential rules "may also be tempered, or even prescribed, by legislative and constitutional declarations of policy." Id. at 172, 623 P.2d at 438. These policy declarations include HRS

chapter 632 and article XI, section 9 of the Hawai'i Constitution.  Id. at 172 n.5, 623 P.2d at 438 n.5.

Our state constitution confers a right to a clean and healthful environment.  Haw. Const. art. XI, § 9; Matter of Maui Elec. Co., Ltd., 150 Hawai'i 528, 538 n.15, 506 P.3d 192, 202 n.15 (2022).  "Though this right is constitutionally vested, its parameters are defined by 'laws relating to environmental quality.'"  Id.; Haw. Const. art. XI, § 9.

HRS § 46-4 governs county zoning.  It provides that "[z]oning in all counties shall be accomplished within the framework of a long-range, comprehensive general plan prepared or being prepared to guide the overall future development of the county."  HRS § 46-4(a).  Counties may regulate "[t]he areas bordering natural watercourses, channels, and streams, in which trades or industries, filling or dumping, erection of structures, and the location of buildings may be prohibited or restricted."  HRS § 46-4(a)(3).  Counties may also establish other regulations "to permit and encourage the orderly development of land resources within their jurisdictions."  HRS § 46-4(a)(12).

Because the counties have the option to engage in conservation efforts via zoning, we hold that the suspension of HRS § 46-4 in this case is related to the "conservation, protection and enhancement of natural resources."  See Ala Loop,

123 Hawai'i at 409, 235 P.3d at 1121.

A fee recovery statute related to environmental quality litigation further supports our conclusion. HRS § 607-25 (2016) allows a private party to recover attorney fees and costs against another private party who develops land without government agencies' permits or approvals. This law "reflects the legislature's determination that [chapter 46] is an environmental quality law." See id. at 410, 235 P.3d at 1122 (citing HRS § 607-25(e)).

In Ala Loop, this court held that HRS chapter 205 was an environmental quality law, in part, because "in enacting HRS § 607-25, the legislature recognized that chapter 205 implements the guarantee of a clean and healthful environment established by article XI, section 9." Id. This court observed that "HRS § 607-25(c) provides that '[f]or purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapter[] . . . 205 . . . and ordinances or rules adopted pursuant thereto under chapter 91.' Thus, permits or approvals required by chapter 205 are expressly covered by the statute." Id.

Ala Loop then described why this fee recovery statute demonstrates the legislative intent to consider chapter 205 a law relating to environmental quality. See id. It quoted the

24

purpose of HRS § 607-25, which in part aimed to "improve the implementation of laws to protect health, environmental quality, and natural resources":

> The legislature finds that article XI, section 9, of the Constitution of the State of Hawaii has given the public standing to use the courts to enforce laws intended to protect the environment. However, the legislature finds that the public has rarely used this right and that there have been increasing numbers of after-the-fact permits for illegal private development. Although the legislature notes that some government agencies are having difficulty with the full and timely enforcement of permit requirements against private parties, after-the-fact permits are not a desirable form of permit streamlining. For these reasons, the legislature concludes that to improve the implementation of laws to protect health, environmental quality, and natural resources, the impediment of high legal costs must be reduced for public interest groups by allowing the award of attorneys' fees, in cases involving illegal development by private parties.

Id. (citing 1986 Haw. Sess. Laws Act 80, § 1 at 104-105) (emphases added). Therefore, based on the legislative intent of HRS § 607-25, this court held that "Chapter 205 is a 'law[] relating to environmental quality' within the meaning of article XI, section 9." Id. at 410, 235 P.3d at 1122.

HRS chapter 46 is also listed among the chapters the legislature considers related to environmental protection.

> For purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapters 6E, 46, 54, 171, 174C, 180C, 183, 183C, 184, 195, 195D, 205, 205A, 266, 342B, 342D, 342F, 342H, 342J, 342L, and 343 and ordinances or rules adopted pursuant thereto under chapter 91.

HRS § 607-25(c) (emphases added). Thus, based on Ala Loop's reasoning, "permits or approvals required by chapter [46] are expressly covered by the statute." See Ala Loop, 123 Hawai'i at

25

410, 235 P.3d at 1122.  And because the legislature in enacting HRS § 607-25 recognized that HRS chapter 46 "implements the guarantee of a clean and healthful environment established by article XI, section 9," we hold that suspension of HRS § 46-4 under the proclamations impacts Plaintiffs' article XI, section 9 right to a clean and healthful environment.  See id.

The affordable housing proclamations initially suspended HRS chapter 46 in its entirety "to the extent necessary to allow for the construction, repair, renovation, and occupancy of housing and infrastructure projects certified under this Proclamation."  In the Fifth Proclamation, the governor modified the suspension of laws section to cite specific sections of HRS chapter 46.  Rather than suspending the entire chapter, the proclamation now only suspended HRS § 46-4 (County Zoning), HRS § 46-1.5 (2012 & Supp. 2023) (impact fees); HRS § 46-142.5 (2012) (School Impact Districts; New Building Permit Requirements), HRS § 46-143 (2012) (Impact Fee Calculation), and HRS § 46-146 (2012) (Time of Assessment and Collection of Impact Fees).

We hold that HRS § 46-4 is a law relating to environmental quality in this case.  The proclamations' suspension of HRS § 46-4 impacts Plaintiffs' constitutional right to a clean and healthful environment.  See Ala Loop, 123 Hawaiʻi at 409-10, 235 P.3d at 1121-22.  Plaintiffs thus have a HRS § 632-1 "concrete

interest" in their right to a clean and healthful environment, which was impacted by suspension of HRS § 46-4. See Tax Foundation, 144 Hawai'i at 189, 439 P.3d at 141.

Suspension of the environmental quality-related statute is a sufficient "concrete interest" in this case to grant Plaintiffs standing to challenge the proclamations' validity. See id.

**C.    HRS § 127A-27 is the proper avenue to challenge emergency proclamations, but Plaintiffs' decision not to pursue that procedure does not bar their suit**

HRS § 127A-27 sets forth detailed procedures for parties challenging proclamations issued under the emergency management statute. These procedures - requiring a three-judge panel and expedited hearings - are virtually identical to the processes from the statute's initial enactment by the Territorial Legislature in 1951. See 1951 Haw. Sess. Laws, Act 268, § 13192, at 632-34.

We hold that these procedures continue to govern challenges to gubernatorial or mayoral actions under HRS chapter 127A.

Per HRS § 127A-27, parties challenging proclamations, orders, or rules made under this chapter must follow specific procedural requirements. A party must submit an application seeking suspension of the proclamation to the circuit court, who must notify the Chief Justice of the Hawai'i Supreme Court. HRS § 127A-27. The Chief Justice then assigns two other circuit

court judges to sit with the circuit court judge to determine the application.  Id.

The application may not be heard or determined until five days after the governor and attorney general receive notice. Id.  The court may issue a temporary stay or suspension of the challenged proclamation for up to ten days, until the application is decided.  Id.  Courts must expedite and give the injunction application precedence, and set a hearing on the application for "the earliest practicable day."  Id.  And if the court grants a stay or suspension, the application must be set for a hearing within five days of the order granting stay or suspension.  Id.

Last, the party who obtained the temporary stay or suspension must proceed with their application for a preliminary or interlocutory injunction.  Id.  For the final hearing of such a suit, the same three-panel judge and expediency requirements apply.  Id.

We hold that this procedure governs suits filed for preliminary and interlocutory injunctions, and for declaratory actions.  See id.  A declaratory action in this context essentially asks for injunctive relief.  It seeks a declaration that the proclamation is void, which would invalidate and therefore suspend the emergency proclamation.  See 22A Am. Jur. 2d Declaratory Judgments § 197 (2025) ("Injunctive relief often

28

flows from a declaratory judgment that a particular law is unconstitutional or otherwise void."). Plaintiffs also frequently seek declaratory judgments and injunctive relief simultaneously when seeking to invalidate government actions. See, e.g., Flores v. Logan, 151 Hawai'i 357, 426, 513 P.3d 423, 360 (2022); Ching v. Case, 145 Hawai'i 148, 155, 449 P.3d 1146, 1153 (2019). The end goal of a preliminary or interlocutory injunction or temporary restraining order related to emergency proclamations is "[an] order[] suspending, enjoining, or restraining the enforcement, operation[] . . . of [the emergency proclamation]." HRS § 127A-27. Thus, declaratory judgments – intended to "afford relief from the uncertainty and insecurity attendant upon controversies over legal rights" – clearly fit within HRS § 127A-27's distinct avenue for relief. See HRS § 632-6 (2016).

We hold that declaratory actions must follow the procedural requirements of HRS § 127A-27.

Plaintiffs, as the State points out, did not follow HRS § 127A-27's procedures. We believe, though, that under the circumstances and the unclear application of HRS § 127A-27 procedures before now, this procedural lapse is understandable. We rule on the merits.

First, as discussed, this case raises significant public interest and access to justice considerations.

29

Second, Plaintiffs understandably relied on the procedure followed in For Our Rights, where the ICA reached the merits of a challenge to the constitutionality of Governor David Ige's COVID-19 proclamations' extension beyond the initial sixty-day proclamation. For Our Rights, 151 Hawai'i at 4, 11, 507 P.3d at 534, 541. In allowing Plaintiffs to amend their quo warranto petition, the circuit court did not mention that claims must follow the HRS chapter 127A framework. We conclude that Plaintiffs reasonably relied on For Our Rights and the circuit court's indications to stray from the HRS § 127A-27 procedural requirements.

By seeking a declaratory judgment, Plaintiffs also understandably looked to our liberal declaratory action laws. HRS chapter 632's purpose is to "afford relief from the uncertainty and insecurity attendant upon controversies over legal rights[] . . . with a view to making the courts more serviceable to the people." HRS § 632-6. Thus, "[o]ur declaratory action laws are 'liberally interpreted and administered.'" Kondo, 153 Hawai'i at 175, 528 P.3d at 248. In our view, Plaintiffs reasonably relied on this broad access to justice purpose in solely seeking declaratory judgment.

Last, this court has an obligation to resolve matters of law. See HRS § 602-5(a) (2016) ("[T]he supreme court shall have jurisdiction and powers . . . [t]o hear and determine all

30

questions of law, or of mixed law and fact, which are properly brought before it by application for a writ of certiorari to the intermediate appellate court or by transfer as provided in this chapter."). Hawai'i law "prefers adjudication on the merits." Dean v. Dep't of Educ., 154 Hawai'i 298, 302, 550 P.3d 1156, 1160 (2024).

Given the public and legal import of Plaintiffs' claims, and the need to provide judicial standards for reviewing emergency proclamations, we address the merits. See id.

**D. The governor's emergency powers**

Only the governor and county mayors have the power to declare a state of emergency. Emergencies may include natural disasters like a tsunami or hurricane. Worldwide crises affecting Hawai'i (like the global pandemic) also qualify. Some emergencies may involve the executive's decisions on distinct issues impacting public health, safety, and welfare. Like this case.

Hawai'i's emergency management statute grants the executive branch wide-ranging powers during emergencies. In addition to the power to suspend laws, the governor may also direct evacuations, enter into mutual aid agreements, restrict congregation in dangerous areas, take possession of and use state property (including airports and schools), and more. HRS § 127A-12 (Supp. 2022).

31

The judiciary's role is not to second-guess the wisdom of executive decision-making under the emergency management statute. Declaring and confronting an emergency is left to the governor. Emergencies call for swift and centralized decision-making. They require efficient government preparation and response. See HRS § 127A-1.

Given the extent of these emergency powers, checks are essential to constrain misuse. Judicial review ensures that an executive's use of emergency power is tailored to the crisis, grounded in fact, and does not become arbitrary, excessive, or indefinite.

The executive branch's discretion to address emergencies impacting health, safety, and welfare is well-established. See, e.g., Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 29 (1905); Grisham v. Romero, 483 P.3d 545, 557 (N.M. 2021).

We hold that a reviewing court will not disturb a governor or mayor's use of emergency powers when (1) the emergency proclamation is rationally related to the health, safety, and welfare of the public, and (2) the executive action taken under the proclamation is reasonably necessary to address the emergency.

First, the declared emergency must have a rational relationship to the public's health, safety and welfare. A plausible factual basis must support the emergency declaration

32

and emergency measures taken.  Courts may not accept mere assertions of necessity.  Rather, the executive must establish a rational connection between the facts, the actions taken, and the restrictions imposed.  Worthington, 440 A.2d at 1137; Amdor, 2025 WL 718840, at *16.

Second, proportionality is key to an executive's exercise of HRS chapter 127A powers.  Emergency actions must be reasonably necessary to address the targeted emergency.  The emergency measures must also be tailored to the specific crisis.  Worthington, 440 A.2d at 1137.  They must be limited in time and scope, and subject to ongoing review or modification as conditions evolve.  If the factual basis for the emergency dwindles or dissolves, continued reliance on emergency authority may be unjustified.  Judicial intervention is then available to protect the public's interest.  Our constitutional structure demands that an executive's use of emergency powers is not arbitrary, excessive, or indefinite.

We conclude that the First Proclamation through the Fifth Proclamation exceeded the scope of the emergency management statute.

These proclamations were rationally related to the health, safety, and welfare of the public.  But the Build Beyond Barriers Working Group and its overly-inclusive certification process, with no specific limitations to *affordable* housing, was

33

not reasonably necessary to address the declared emergency.  The First Proclamation, in particular, swept too broadly.  It suspended twenty-two chapters and statutory provisions of the Hawai'i Revised Statutes.  See HRS § 127A-13(a) (the governor may "[s]uspend any law that impedes or tends to impede or be detrimental to the expeditious and efficient execution of, or to conflict with, emergency functions").  And it appended rules that consolidated significant decision-making power with the SLHO – outside the structure of legislatively authorized state agencies.

Because affordable housing projects have already been approved through the expedited certification process, this holding applies prospectively.  We do not invalidate the first five emergency proclamations.

The Sixth Proclamation through the Fifteenth Proclamation, in contrast to the earlier proclamations, did *not* exceed the governor's authority.  Those emergency proclamations satisfied HRS chapter 127A.  They were (1) rationally related to the health, safety, and welfare of the public, and (2) reasonably necessary to address the emergency.

We begin by detailing the powers granted under Hawai'i's emergency management statute.

## 1.  The emergency management statute

Like most states, Hawai'i's emergency management statute

grants the governor and county mayors vast powers to prepare for and address emergencies.  HRS §§ 127A-1, 127A-12, 127A-13; see For Our Rights, 151 Hawai'i at 7, 507 P.3d at 537.

In 2014, the legislature recognized the "increasing possibility of the occurrence of disasters or emergencies of unprecedented size and destructiveness resulting from natural or human-caused hazards."  HRS § 127A-1.  HRS chapter 127A confers powers to the governor and county mayors "necessary to prepare for and respond to emergencies and disasters."  Id.  These powers, the legislature reasoned, are necessary "generally to protect the public health, safety, and welfare and to preserve the lives, property, and environment of the State."  Id.

The legislature was clear that these emergency powers are intentionally broad.  "It is the intent of the legislature to provide for and confer comprehensive powers for the purposes stated herein.  This chapter shall be liberally construed to effectuate its purposes."  HRS § 127A-1(c) (emphases added).

HRS chapter 127A defines "emergency" expansively, encompassing both sudden events and ongoing conditions that threaten substantial harm to Hawai'i's people, property, or environment.  The legislature designated the governor as the "sole judge" of whether such circumstances exist.  HRS § 127A-14(c).  This reflects legislative intent to enable fast and flexible executive response in times of crisis.  The executive

branch must have the authority to respond to emergencies with agility and resolve.

We believe that not only discrete events, but also ongoing or evolving conditions that result in significant public harm, are covered by HRS chapter 127A.  See Worthington, 440 A.2d at 1134-35; Amdor, 2025 WL 718840, at *9, *13.  There is no statutory requirement that emergencies be unexpected or previously non-existent.  See HRS § 127A-13; Amdor, 2025 WL 718840, at *9, *13.  Rather, long-term issues may reach a level of severity that requires government intervention.  See Amdor, 2025 WL 718840, at *9, *13.

HRS § 127A-14 covers the governor's emergency powers.  To issue an emergency proclamation, the governor must find that an "emergency" or "disaster" has occurred or is imminent:

> (a) The governor may declare the existence of a state of emergency in the State by proclamation if the governor finds that an emergency or a disaster has occurred or that there is imminent danger or threat of an emergency or a disaster in any portion of the State.

HRS § 127A-14(a).

"Disaster" is defined by this chapter as "any emergency, or imminent threat thereof, which results or may likely result in loss of life, property, or environment and requires, or may require, assistance from other counties, states, the federal government, or from private agencies."  HRS § 127A-2 (Supp. 2022).  "Emergency" is defined as "any occurrence, or imminent

threat thereof, which results or may likely result in substantial injury or harm to the population or substantial damage to or loss of property or substantial damage to or loss of the environment." Id.

"Occurrence" is undefined by HRS § 127A-2. See id. Both sides concentrated on this word. Is the affordable housing crisis an "occurrence" such that it is a valid "emergency"?

First, we discuss the parties' positions regarding the definition of a "disaster" or "emergency" under HRS chapter 127A. Plaintiffs and the State spar over how sudden or unexpected an emergency must be. "Occurrence," Plaintiffs contend, "is defined as a 'thing that occurs, happens, or takes place; an incident or event' . . . or 'esp[ecially] something that happens unexpectedly and without design: HAPPENING.'" The State counters that "occurrence" may include "continuing condition[s]." As shown by the global pandemic, the State explains, where emergency situations develop over time "and are the result of myriad factors," limiting an "emergency to situations where there is a single, identifiable causal 'event' would be unworkable."

We side with the State. A narrow reading of "occurrence" (and hence, "emergency") unduly constrains the legislature's intent to centralize executive powers and promote agile, adaptable responses to an emergency. Thus, a long-standing

37

issue that has escalated such that a swift, centralized response is needed, may constitute an emergency.  There is no need for the issue to have "sudden" or "unexpected" qualities.  See Amdor, 2025 WL 718840, at *13.

Worthington articulated how prison overcrowding escalated from a long-term concern to an "emergency."  Under New Jersey law, a "disaster" is any "unusual incident" that "endangers the health, safety or resources of the residents" and is "too large in scope or unusual in type to be handled in its entirety by regular municipal operating services."  440 A.2d at 1133.  (Per that state's statute, an "emergency" *is* a "disaster.")  Id. Plaintiffs argued that there was no "emergency."  Id.  Because prison overcrowding had been recognized as a major problem as early as 1977, it was not "unusual."  Id.  Overcrowding was also not an "incident," Plaintiffs said, because there was no "sudden or unforeseen event."  Id.

The court disagreed.  It rejected "this overly narrow interpretation of the scope of the act."  Id. at 1134.  "It is not a necessary component of an 'emergency' that it be sudden or unforeseen."  Id. at 1135.  The court centered the inquiry: "[t]he question is not whether the incident emerged suddenly, but whether the scope of the present crisis prevents local governments from safeguarding the people, property and resources of the State."  Id. at 1134.

Long-term issues may reach a breaking point. The record supported that "the problem of prison overcrowding in New Jersey ha[d] reached dangerous proportions," the court observed in Worthington. Id. at 1131, 1135. Thus, the years-long prison overcrowding issue grew to an emergency. Id. Foreseeability or prior government inaction is beside the point. Id. at 1135. "Even if the current crisis were due in part to legislative and executive failure to remedy a foreseeable, growing problem, this would in no way deprive the Governor of the power under the statute to protect the public against the disaster it now faces." Id.

Amdor expressed similar principles. It held that petitioners challenging emergency orders that "address[ed] gun violence and drug abuse as public health emergencies pursuant to the [New Mexico] Public Health Emergency Response Act" failed to "show that requiring a public health emergency to be sudden or unforeseen is necessary to abide with legislative intent." Amdor, 2025 WL 718840, at *1, *13. There was no evidence that the New Mexico Legislature did not intend the statute to apply to "a *preexisting* condition or agent that rises to an extremely dangerous or highly infectious level" or "a serious threat to the public health requiring immediate response but not necessarily sudden or unforeseen in nature." Id. at *13. And

there was no legislative signal that the emergency must be "novel or unexpected." Id.

We follow a similar approach. We reject an overly narrow definition of "emergency" or "disaster" under HRS chapter 127A. See HRS §§ 127A-2, 127A-14. When a crisis or issue plaguing the state or a county amplifies to endanger public health, safety, and welfare, the executive branch has discretion to act.

The executive's discretion, though, is not absolute. Emergency powers must be exercised within constitutional bounds and subject to judicial review. See Jacobson, 197 U.S. at 29; Amdor, 2025 WL 718840, at *15 ("[A]s Jacobson and other cases make clear, an exercise of the police power is subject to judicial review regardless of whether the wielder of the power is the legislative or executive branch.").

The State suggests that because a governor may declare an emergency in their "sole" judgment, the validity of the proclamation may not be challenged. Plaintiffs are out of luck, the State's point goes, because the governor "shall be the sole judge of the existence of the danger, threat, or circumstances giving rise to a declaration[] . . . of a state of emergency in the State[.]" See HRS § 127A-14(c).

The State's stance eliminates any look at the validity of an executive's declaration of an emergency. A circumstance is an emergency so long as the governor says so. No questions

asked.  We decline to abdicate our judicial role and give the executive branch absolute, unchecked power to declare an emergency.

Judicial review is fundamental to ensuring balance within our government's co-equal structure.  The executive's use of emergency powers, therefore, is always subject to judicial review.  See Alaka'i Na Keiki, Inc. v. Matayoshi, 127 Hawai'i 263, 279-82, 277 P.3d 988, 1004-07 (2012) (judicial review is available "even in the face of language that unambiguously precludes judicial review" when constitutional rights are impacted, and where "the agency has acted illegally, unconstitutionally, or in excess of its jurisdiction").  Also, we note that the emergency management statute expressly contemplates judicial review.  See HRS § 127A-27.

Plaintiffs claim that the governor exceeded his authority.  Because there is judicial review of the governor's use of emergency powers, Plaintiffs have access to justice to challenge the governor's emergency proclamations.

Next, we prescribe the standard for judicial review of executive actions.

## 2.   A standard for judicial review of executive actions under HRS chapter 127A

The governor and county mayors have broad discretion to declare and address emergencies.  As mentioned, these powers

41

have limits. Our standard provides a framework for evaluating executive actions under HRS chapter 127A. The use of these powers must be both rationally related to public health, safety, and welfare, and reasonably necessary to address the emergency. This approach ensures that extraordinary powers are exercised only to the extent necessary, are grounded in fact, and remain subject to meaningful judicial review.

The dual test we adopt operates as a substantive check on executive authority. It promotes evidence-based, proportionate responses to emergencies, preserves the constitutional structure of government, and protects the rights of the people of Hawai'i against government overreach.

Jacobson's "real or substantial relation" framework informs our thinking. See 197 U.S. at 31. The Supreme Court reviewed Massachusetts' mandatory vaccination law during that state's early 20th century smallpox epidemic. Id. at 30-31. The government may limit individual rights to address public health and safety, the Court held. Id. at 29-31. But that power is not absolute or unchecked. State action during a public health crisis must genuinely connect to the public health objective and not constitute a "plain, palpable invasion of rights secured by the fundamental law." Id. at 31.

Courts have widely adopted Jacobson's deference to state and local officials during public health emergencies. See,

42

e.g., Desrosiers v. Governor, 158 N.E.3d 827, 842 (Mass. 2020) ("[W]e will look to see whether the emergency orders bear a 'real or substantial relation to the protection of the public health,' . . . and will not second guess the emergency orders."). The global pandemic heightened understandings about the use of executive police powers and reacquainted courts with Jacobson's lessons. See, e.g., Health Freedom Def. Fund, Inc. v. Carvalho, No. 22-55908, 2025 WL 2167401, at *8 (9th Cir. July 31, 2025) (upholding a Los Angeles school district's pandemic vaccination policy and concluding that Jacobson was binding).

Recent cases refine Jacobson's deferential view, articulate sensible standards, and guide our approach to emergencies. See generally Worthington, 440 A.2d 1128; Amdor, 2025 WL 718840; Beshear v. Acree, 615 S.W.3d 780 (Ky. 2020). These cases reason that emergency measures must be supported by credible evidence and tailored to the specific emergency, with ongoing judicial review to validate the necessity and proportionality of the executive actions as conditions evolve. They reinforce the principle that initial deference to executive action is appropriate. But that deference to the executive's rationale may wane as the emergency goes on, and therefore, courts must assess whether continued measures remain justified and appropriately limited.

We adopt a standard that executive actions during

emergencies must be rationally related to public health, safety, and welfare, and reasonably necessary to address the declared emergency.

### a.   Rational Relationship

HRS chapter 127A grants the governor and county mayors broad discretion to declare an emergency.  HRS chapter 127A delegates police power during (or "to prepare for") disasters and emergencies.  See HRS § 127A-1.  These powers have limits.  See HRS § 127A-14(a).

So what constrains a governor or mayor from unlocking vast powers by declaring an emergency?  We hold that a declaration of emergency must be rationally related to the public's health, safety, and welfare.  See, e.g., Amdor, 2025 WL 718840, at *15 ("[W]e must assess 'whether the crisis or emergency upon which the executive bases its exercise of police power is legitimate and whether the executive action is reasonably related to the response to the asserted crisis or emergency.'"); Acree, 615 S.W.3d at 819 ("[T]he individual orders and regulations at issue in this case are only deficient under [the Kentucky constitution] if they are *unreasonable* – that is lack a rational basis.") (emphasis added); Worthington, 440 A.2d at 1138 (the exercise of the governor's emergency powers is proper "when [their] actions are authorized by the Disaster Control Act, are rationally related to the goal of protecting the public, and are

tailored to the gravity of the emergency").

We note that the phrase "rationally related," at first glance, resembles the "rational basis" standard that courts use to appraise constitutional challenges to statutes or county ordinances involving non-fundamental rights. See Daoang v. Dep't of Educ., 63 Haw. 501, 504-05, 630 P.2d 629, 631 (1981) (judicial review of statutes under the "rational basis test" is limited). Review of executive action – especially when it comes to emergency powers - is different. See Worthington, 440 A.2d 1135 ("In reviewing executive actions undertaken pursuant to delegated emergency powers, we must determine whether the actions are authorized by the statute. This involves, first, a determination of whether the Executive Order bears a rational relationship to the legislative goal of protecting the public.").

"Rational basis review" is the hands-off, highly deferential test used to evaluate statutes challenged under the equal protection and due process clauses. The standard offers generous latitude to legislative judgment. KNG Corp. v. Kim, 107 Hawai'i 73, 83, 110 P.3d 397, 407 (2005) (rational basis review examines whether a statute "rationally furthers a legitimate state interest"). As State v. Mallan stressed, because "it is not within our role to usurp the responsibilities of the legislature[] . . . [u]nless fundamental rights are

45

infringed, due process requires only that legislation survive rational basis review." State v. Mallan, 86 Hawai'i 440, 454, 950 P.2d 178, 192 (1998). For equal protection claims, a statute meets rational basis review if the challenged suspect classification rests on "some ground of difference having a fair and substantial relation to the object of the legislation, and is therefore not arbitrary and capricious." AlohaCare v. Dep't of Hum. Servs., 127 Hawai'i 76, 89, 276 P.3d 645, 658 (2012); Hawaii Insurers Council v. Lingle, 120 Hawai'i 51, 71, 201 P.3d 564, 584 (2008). For those claims, the burden rests with the petitioner, who must show "with convincing clarity" that "the legislature's classification is not rationally related to the purpose of the challenged statute." AlohaCare, 127 Hawai'i at 89, 276 P.3d at 658.

Whether an executive's declared emergency is rationally related to public health, safety, and welfare is still a respectful and deferential standard. Judicial review of the governor's use of emergency powers under HRS chapter 127A, however, requires a more exacting assessment than when this court examines the constitutionality of a law passed by the legislature. Executive emergency proclamations must address more than a "legitimate government interest." Under HRS chapter 127A, they must aim to address public health, safety, and welfare based on a clear, factually-supported crisis.

We believe that a "rational relationship" assessment requiring factual support, as detailed in Amdor, aptly evaluates the executive branch's exercise of police power under HRS chapter 127A when compared to the low bar for assessing legislative action.  See AlohaCare, 127 Hawai'i at 89, 276 P.3d at 658.  While a reviewing court does not conduct fact-finding to substantiate the executive's emergency proclamation, we hold that there must be an articulated factual basis to support an emergency declaration.

Amdor describes a clear factual basis for an emergency.  In Amdor, the New Mexico governor declared a public health emergency due to gun violence.  2025 WL 718840, at *1.  The court held that the "emergency measure 'must have some fair tendency to accomplish, or aid in the accomplishment of,' that legitimate police power purpose."  Id. at *16.  The executive order related that "'guns are the leading cause of death among children and teens in New Mexico' and cite[d] relevant deaths of thirteen-, five-, and eleven-year-old victims."  Id.  "Against this factual backdrop," the court concluded, "prohibiting firearm possession from areas frequented by children has some fair tendency to aid in the accomplishment of fewer gunshot-related deaths among children."  Id.  The emergency orders prohibiting firearm possession were rationally related to

47

addressing documented gun violence impacting child victims.  See id.

We believe this sensible approach to judicial review aligns with HRS chapter 127A's legislative intent to grant executive powers to prepare for and respond to specific emergencies. Requiring a governor's emergency proclamation to be rationally related to public health, safety, and welfare forestalls executive overreach, while allowing the government to nimbly address an emergency.  But this level of review still requires something more than the lesser burden of statutory "rational basis" review.  See AlohaCare, 127 Hawai'i at 89, 276 P.3d at 658.  The executive must specifically demonstrate how the emergency impacts public health, safety, and welfare, and factually justify extraordinary government intervention.  See Amdor, 2025 WL 718840, at *16.

Here, the affordable housing proclamations are rationally related to public health, safety, and welfare.  And they articulate a factual basis for the emergency declaration.

The governor's proclamations establish a sufficient factual basis for the affordable housing emergency.  The First Proclamation articulated the emergency for subsequent proclamations.  The lack of affordable housing, it declared, leads to (1) essential worker and Native Hawaiian migration from the state, (2) mental health challenges like chronic stress,

48

anxiety, and depression, (3) physical health conditions like health disease, stroke, and cancer, (4) kūpuna poverty, and (5) reduced quality of life for families, such as barriers to educational achievements, nutritious food, medical care, and stability.

We briefly outline the proclamations' preamble describing the affordable housing emergency.

First, the proclamation detailed the impact of the "housing crisis" on residents' physical and mental health and the emigration of talented or essential workers and Native Hawaiian residents.  It described the increase in housing costs, Hawai'i's high cost of living, and how a "large segment of the population that earns too much to qualify for traditional affordable housing programs, yet too little to afford to buy or rent market rate housing."  The proclamation also highlighted, generally, emigration from the state.  It cited the loss of essential workers such as "healthcare, construction, and educational professionals" and "talented local people," and a "decrease in our Native Hawaiian population."

Then the proclamation announced that "living in unaffordable housing is associated with a higher risk of chronic health conditions such as elevated levels of cholesterol, respiratory infections, coronary heart disease, cardiovascular disease, arthritis, stroke and cancer."  Unaffordable housing,

the proclamation continued, is "also associated with mental health challenges, including chronic stress, anxiety and depression."

Last, the First Proclamation remarked that the high cost of housing impacts families and elderly residents.  Unaffordable housing requires elderly residents to pay for increased housing costs out of fixed incomes, "contributing to approximately 22,000 [kūpuna] living in poverty[.]"  The proclamation also commented that "affordable housing is associated with better health, childhood development, and educational achievement by freeing up more of a family's budget for more nutritious food, access to medical care, and stability where family members can thrive."

A reviewing court need not conduct fact-finding to justify the emergency declaration.  A rational relationship only requires some factual basis.  See Amdor, 2025 WL 718840, at \*16.

To find a factual basis, courts do not probe and parse statistics, such as the degree to which chronic health conditions are substantially linked to a lack of affordable housing (as opposed to other factors).  Thus, plausible, good faith factual assertions and theories may bridge the relationship between an emergency and the harm to health, safety, and welfare.

50

We conclude that the First Proclamation sets forth a rational relationship between affordable housing and the health, safety, and welfare of Hawai'i residents.

Here, the First Proclamation identified public health, safety, and welfare harms grounded in plausible facts. The high cost of living in Hawai'i, the Native Hawaiian diaspora, metrics exploring Hawai'i's houseless populations, the common sense link between unaffordable housing and elevated stress, physical and mental health conditions, and impacts on kūpuna, are all rationally related to the public's health, safety, and welfare. Thus, addressing affordable housing is rationally related to protecting public health, safety, and welfare.

This rational relationship holding applies to each proclamation in the series. Because later proclamations based on the same "emergency" declared in the First Proclamation incorporate this rationale, we conclude that all proclamations (through the Fifteenth Proclamation) recite a rational relationship between affordable housing and public health, safety, and welfare.

We also recognize that in some cases, an emergency proclamation may directly impact a person's fundamental constitutional rights. Liberty interests and property takings come to mind. A heightened standard of review may then apply. See Gonzales v. Inslee, 535 P.3d 864, 874 (Wash. 2023).

51

The legislature has granted the governor and mayors discretion to respond quickly to emergencies.  Our standard demands that the executive's declarations are rooted in fact, and related to public health, safety, and welfare.  Here, the proclamations pass the test.

### b.    Reasonably necessary

Next, we examine whether the proclamations' measures are reasonably necessary to address the declared affordable housing emergency.  Proportionality controls the executive's response to the emergency.  The actions taken must be sufficiently limited in time and scope to resolving the issue.  And they must be commensurate to addressing the emergency.

Whether the executive action taken under the proclamation is "reasonably necessary" depends on whether the action is reasonably related to mitigating the declared emergency.  Amdor, 2025 WL 718840, at *16 ("prohibiting firearm possession from areas frequented by children has some fair tendency to aid in the accomplishment of fewer gunshot-related deaths among children and thus is reasonably related to addressing gun violence as declared and explained in the emergency orders"); State v. Lee, 51 Haw. 516, 517, 465 P.2d 573, 575 (1970) ("To justify the state in . . . interposing its authority [o]n behalf of the public, it must appear - [f]irst, that the interests of the public (generally, as distinguished from those of a

particular class) . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.").

The "reasonably necessary" analysis turns on proportionality. The extent, scope, or scale of the emergency determines the measures reasonably necessary to address the emergency. As the emergency intensifies or wanes, the governor's responsive measures must accelerate or wind down proportionately.

If an emergency is more acute and life threatening, and affects a large swath of the population, then a substantial response may be warranted. Worthington, 440 A.2d at 1137 ("The statutory validity of executive actions pursuant to emergency power will depend on the nature of the emergency and the gravity of the threat to the public. Thus, a more serious emergency may justify greater responsive measures."). In contrast, where the emergency impacts fewer people and involves comparatively lesser impacts, the response must be tailored. A governor must limit an emergency response under HRS chapter 127A to the magnitude and scope of the potential harm. See id.

Here, the governor's response involved the suspension of laws and the issuance of rules for certification of affordable housing projects. The rules clarifying the application of the suspension of laws were "intended to expedite the construction,

development, and redevelopment of housing under the [proclamations]."

We conclude that the governor's directives establishing the Build Beyond Barriers Working Group and the project certification process in the First Proclamation through the Fifth Proclamation are not reasonably necessary to address the declared affordable housing emergency.

To repeat, this ruling is prospective, so we do not invalidate those emergency proclamations. To clarify our judicial review standard though, we go on.

Because the first five proclamations' certification process expedited *all* housing development – not just affordable housing projects – the measures were not reasonably necessary to address the affordable housing emergency. The first five proclamations did not limit the proclamations' rules to *affordable* housing projects. They gave priority to affordable housing, but all developments could be fast-tracked.

More housing alone does not correlate to more affordable housing in the short term. Expediting development generally is not a targeted, urgent solution to the lack of affordable housing. The certification process opened the suspension of laws and rules to all housing projects. Thus, it was not reasonably necessary to address the declared affordable housing emergency.

54

Though the Working Group was told to prioritize affordable housing, the certification process was open to any residential development. Per the First through Fifth Proclamations' rules, project proponents could submit applications to the Working Group for certification. Projects under the first five proclamations were eligible for certification if the proponent had the "skill and experience to develop and manage a project of the intended size and scope," had successfully completed and managed a housing development, and the project was likely to commence within 36 months from certification. The Working Group was instructed to prioritize project processing "based on, but not limited to" (1) the number of proposed affordable housing units, (2) project financing status, and (3) the proposed commencement and completion dates.

The First Proclamation opened the certification process to "multi-unit development or redevelopment projects that replace existing residential units or creates additional residential units" and "infrastructure that will primarily provide services to housing." The proclamation's rules only asked the Working Group to prioritize projects that "inclu[de] . . . affordable housing as a component of the certified project" and added that "[t]he amount of affordable housing included in the project may affect the priority given the project."

The first five proclamations and their rules did not detail

a minimum percentage of affordable housing units required for proposed projects to receive certification. The purpose of the emergency proclamation is the creation of *affordable* housing. We conclude that such an expansive certification process outlined in the first five proclamations, absent further limitations, was not reasonably necessary to address the declared affordable housing emergency.

The Sixth Proclamation applied to (1) state or county affordable housing projects (projects built on state or county land and owned by Hawai'i Public Housing Authority or HHFDC), (2) "affordable housing projects" (projects that have existing agreements with HHFDC under HRS chapter 201H or have an agreement with a county under an income restriction ordinance), and (3) HHFDC "certified affordable housing projects" (sixty percent of the units must be for sale or rent to individuals who earn 0% to 140% of the area median income).

We conclude that the Sixth Proclamation's transfer of the certification function to the HHFDC is reasonably necessary to address the declared affordable housing emergency. Returning decision-making to an agency already managing affordable and low-income housing financing and development programs – and one with expertise in that area - makes practical sense and respects existing governance structures. <u>See, e.g.</u>, HRS §§ 201H-12 (2017), 201H-33 (2017), 201H-59 (2017), 201H-206 (Supp. 2021).

Thus, beginning with the Sixth Proclamation, projects may proceed under the proclamations' suspension of law and rules if they are state or county affordable housing projects and affordable housing projects certified by HHFDC. A state or county agency that supports housing administration, regulation, production, or infrastructure for personnel recruitment and procurement may also proceed under the proclamations' law suspensions and rules.

The Sixth Proclamation through the present proclamation (Fifteenth Proclamation) limits the proclamations' applicability more directly to affordable housing development. It also returns decision-making to HHDFC. Thus, these proclamations are reasonably necessary to address the declared emergency.

To aid the executive branch, our courts, and others, and because precedent interpreting Hawai'i's emergency management statute is slim, we further discuss this case's context. Of the first five proclamations, the First Proclamation took an overly broad approach to addressing the declared emergency. In addition to establishing the Working Group, the First Proclamation created a State Lead Housing Officer position and suspended twenty-two chapters and statutory provisions.

The State Lead Housing Officer "confirmed" all projects certified by the Working Group, and could approve state or county projects "suitable to proceed without first going through

certification." The SLHO also had the power to determine whether projects were exempt from certain historic preservation and environmental review processes under HRS chapters 6E and 343.

The First Proclamation suspended, among other chapters and statutory provisions, HRS chapter 6E (historic preservation), HRS chapter 103D (the procurement code, in relation to solicitation), HRS chapter 46 (general provisions related to county organization, including zoning), HRS chapter 76 (civil service), HRS chapter 343 (environmental impact statements), HRS § 201H-38 (HHFDC housing exemptions), and HRS §§ 205-3.1(a) and 205-4(a) (Land Use Commission district boundary amendment provisions).

The First Proclamation's suspensions were subject to appended "Rules Relating to Project Certification Pursuant to the Governor's Emergency Proclamation Relating to Housing." The rules "intended to expedite the construction, development, and redevelopment of housing under the [First Proclamation] through the certification of projects that will be allowed to proceed under the [proclamation]."

We outline the rules relevant to some of the broader suspensions.

For HRS chapter 6E, the proclamation rules provided that the SLHO and Working Group may determine that projects in

58

"nominally sensitive areas" "may proceed without further review" under the chapter.  Projects in "moderately sensitive areas" may proceed without further review so long as they proceed under an "archaeological monitoring program to be implemented by a qualified archaeological firm[.]"  Only projects in "highly sensitive areas" – a term established only by the proclamations, and not defined under HRS chapter 6E – require an archaeological inventory survey.

Next, for HRS chapter 103D, the proclamation rules limited the suspension of the procurement code to solicitation where "the department has determined that it is not practicable or advantageous to procure the services required via traditional procurement methods."  The proclamation rules for HRS chapter 46 allowed the counties to "adopt reasonable standards to allow the construction of multi-family residential dwelling units on any lot where business activities are permitted."

Last, HRS chapter 343.  According to the First Proclamation's rules, prior to approving suspension of HRS chapter 343, the SLHO "shall make a determination for each certified project whether the project is likely to cause the irreversible and irretrievable commitment of resources that cannot be mitigated should it be implemented or whether the cumulative impact of planned successive actions in the same place, over time, is likely to be significant, or whether an

action that is normally insignificant in its impact to the environment may be significant in a particularly sensitive environment."

If the SLHO finds that a project is "likely not . . . significant in its impact," the project may proceed. But if the SLHO finds the project is "likely to cause the irreversible and irretrievable commitment of resources that cannot be mitigated or which may be significant in its impact either cumulatively or because it is being proposed in a particularly sensitive environment," the project is subject to the environmental review process under HRS chapter 343.

These suspensions and rules delegating major decision-making to a newly created executive position are not reasonably necessary to address affordable housing. The proclamations do not assert the insufficiency of existing agencies to achieve its decision-making and streamlining goals. Further, while the law suspensions and certification rules are related to expediting affordable housing construction generally, suspending large sections of these chapters is disproportionate to the proclamations' recited long-term, gradual harms.

Thus, while we consider all proclamations' declared affordable housing emergency rationally related to health, safety, and welfare, we conclude that the first five proclamations' suspension of laws and rules were not reasonably

necessary to address affordable housing.  The governor's actions under those proclamations exceeded the scope of his emergency powers.

We end this section with a comment on protracted emergencies.  In For Our Rights and other pandemic era challenges, plaintiffs challenged serial proclamations that extended into years-long emergencies.  See For Our Rights, 151 Hawai'i at 11, 507 P.3d at 541; CT Freedom All., LLC v. Dep't of Educ., 287 A.3d 557, 564-65 (Conn. 2023).  As stated, the scope of the emergency actions taken is one aspect of "necessity" that's examined.  But courts also look at duration.  How long is emergency action necessary?  And how long is too long?

An executive's measures may no longer be reasonably necessary if they continue indefinitely or are used to effectuate permanent policy change without legislative involvement.  See Cnty. of Gloucester v. State, 623 A.2d 763, 768 (N.J. 1993) ("There is no temporal rule of thumb for determining when an 'emergency' ceases to exist.  Rather, courts should consider the passage of time, and other factors such as the extent to which the problem is within the government's control, and the extent to which remedial efforts have been undertaken.") (citations omitted)).

Thus, we tack away from the ICA's suggestion in For Our Rights that legislative inaction constitutes ratification of

extended "emergencies." See For Our Rights, 151 Hawai'i at 11, 507 P.3d at 541; Worthington, 440 A.2d at 1138 ("[I]n the absence of a legislative response, such properly grounded executive actions could continue to be exercised as long as the emergency posed a threat to the public."); Cnty. of Gloucester, 623 A.2d at 769 ("[A]s in Worthington, we remain unwilling 'to infer such a legislative intent from mere legislative inaction in the face of the continued exercise of emergency power by the Governor.'").

The severity of the emergency informs the proportionality of the response, including the duration of the response. Just as a long-term issue may become an emergency based on increasing danger to the public, an overly-lengthy response may no longer be necessary to address a decreasing or resolved issue.

In Hawai'i, emergency proclamations are only valid for sixty days. HRS § 127A-14(d) ("A state of emergency and a local state of emergency shall terminate automatically sixty days after the issuance of a proclamation of a state of emergency[.]"). After a proclamation terminates, the governor must issue a new proclamation. For Our Rights, 151 Hawai'i at 10, 507 P.3d at 540 ("[HRS § 127A-14(d)] does not expressly preclude the Governor from issuing more than one emergency proclamation based on the same emergency.").

Just because a single proclamation is limited by statute to

sixty days does not mean the proclamation is "reasonably necessary" to address the emergency.  We consider the total duration of the emergency dispositive.  When the "emergency" response begins to resemble regular government operations and functions (or a substitute for policy decisions delegated to executive branch agencies or the legislature), the emergency may no longer be necessary.

Two years in, we believe the affordable housing proclamations still demonstrate reasonable necessity.  We stress though that a "forever" emergency may no longer be reasonably necessary when it replaces policy decisions better handled by the legislature, or it exceeds a reasonable time for "emergency" remediation.  See Cnty. of Gloucester, 623 A.2d at 768.

We hold that executive actions taken pursuant to an emergency declaration under HRS chapter 127A must satisfy a dual test.  Emergency powers may only be used when (1) the emergency proclamation and subsequent actions are rationally related to the health, safety, and welfare of the public, and (2) the actions taken are reasonably necessary to address the emergency.

**E.    The proclamations did not violate the separation of powers**

Plaintiffs claim that the proclamations violate the separation of powers doctrine.  They say the proclamations "purport[] to rewrite multiple statutes by suspending portions of them and imposing new structures and processes through which

they may be augmented or modified." The governor's interpretation of HRS chapter 127A to change laws and create new rules, Plaintiffs believe, violates the separation of powers.

The State counters that the legislature delegated to the governor the power to suspend laws under HRS § 127A-13(a)(3) and the power to enact rules to carry out suspensions under HRS § 127A-25.

The separation of powers doctrine is not expressly mentioned in the Hawai'i Constitution. State v. Rogan, 153 Hawai'i 233, 245, 573 P.3d 616, 628 (2025). "But in Hawai'i, this court recognizes the 'sovereign power is divided and allocated among three co-equal branches.'" Id. (citing Alaka'i Na Keiki, 127 Hawai'i at 275, 277 P.3d at 1000).

Separated powers is a core principle of our constitutional system. "Separation of powers concerns arise when one branch of government interferes with another's authority." Id. The doctrine aims "to preclude a commingling of essentially different powers of government in the same hands and thereby prevent a situation where one department would be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments." Alaka'i Na Keiki, 127 Hawai'i at 275, 277 P.3d at 1000.

Per Hawai'i's emergency management statute, the governor may

"[s]uspend any law that impedes or tends to impede or be detrimental to the expeditious and efficient execution of, or to conflict with, emergency functions." HRS § 127A-13(a)(3). The laws may be suspended only in response to a declared state of emergency and only during the emergency period. Id. "For the purpose of carrying out any provision of this chapter, the governor may adopt rules for the State and the mayor may adopt rules for the county which may, if so stated in the rules, have the force and effect of law." HRS § 127A-25(a). "Such rules shall not be subject to chapter 91." Id.

Plaintiffs' argument that the governor's interpretation of HRS chapter 127A invades the legislature's lawmaking powers lacks merit. The emergency proclamations do not "interfere with the functions of the Legislature," nor do they "deprive the Legislature of its full authority to pass laws." See Desrosiers, 158 N.E.3d at 840-41 (no separation of powers violation because the emergency orders did not prevent the legislature from passing legislation to address COVID-19). The governor did not usurp the legislature's role by passing new laws or acting outside the scope of his delegated authority. See id.; Alakaʻi Na Keiki, 127 Hawaiʻi at 275, 277 P.3d at 1000. Rather, the governor's rules were authorized by statute, and directly related to the suspension of laws under the proclamation. HRS §§ 127A-13(a)(3), 127A-25. Thus, we hold

that the rules appended to the emergency proclamations were a valid exercise of HRS chapter 127A emergency powers.

That the governor's rules under HRS § 127A-25(a) carry the "force of law," does not mean the rules involved legislatively-reserved "lawmaking."  Wolf v. Scarnati, 233 A.3d 679, 704 (Pa. 2020) ("Executive orders that affect individuals outside the executive branch 'implement existing constitutional or statutory law.'. . .  But an executive order or an administrative regulation promulgated by an executive agency that implements a statute still has the *force of law*.  Otherwise, no entity outside the executive branch could be compelled to abide by a regulation issued by an executive branch agency.  Such a result would be inconsistent with long-standing precedent.").  The governor's statement that the certification rules "carry the force of law" thus only reflects that the rules are authorized by statute – not that the governor seeks to engage in unauthorized lawmaking.  See id.

Though Plaintiffs did not raise the non-delegation doctrine, it often surfaces in separation of power cases.  The State argued that the Governor's suspension of laws and rules were "within the authority vested in the Governor by the Legislature during a time of emergency, and do not present separation of powers concerns."  We reason that granting the governor the authority to suspend laws and make rules to carry

out the emergency management statute in HRS § 127A-13(a)(3) and HRS § 127A-25 does not violate the non-delegation doctrine. See Application of Kauai Elec. Div. of Citizens Utilities Co., 60 Haw. 166, 181, 590 P.2d 524, 535 (1978) ("[Hawai'i] has adopted the nondelegation doctrine as part of its own body of constitutional law.").

Plaintiffs raising separation of powers claims to contest pandemic-related emergency powers often relied on the non-delegation doctrine. See Casey, 258 A.3d at 663-66; Acree, 615 S.W.3d at 805.

The statutory safeguards, courts held, were what separated permissible delegated powers from unconstitutionally-granted legislative powers. Casey v. Lamont held that the legislature did not impermissibly delegate its lawmaking function because it "was as precise as it could be in defining the contours of the governor's authority given that there are myriad serious disasters that could arise and the actions the governor would be required to take could vary significantly from one serious disaster to another." 258 A.3d at 667. Likewise, Beshear v. Acree held that there was no violation of the non-delegation doctrine. 615 S.W.3d at 805. The emergency statute includes "'safeguards, procedural and otherwise, which prevent an abuse of discretion' thereby 'protecting against unnecessary and uncontrolled discretionary power.'" Id. at 809 (citations

67

omitted).

Here, we hold that the legislature did not unconstitutionally delegate legislative power to the executive branch in enacting HRS chapter 127A. The scope and duration of the emergency "defin[e] the contours" of the governor's powers. See Casey, 258 A.3d at 667. The governor may only suspend laws related to the emergency, and may only suspend those laws during the emergency period. HRS § 127A-13(a)(3).

We conclude that HRS chapter 127A's statutory limitations establish clear safeguards to "protect against uncontrolled discretionary power." See Acree, 615 S.W.3d at 809; Casey, 258 A.3d at 663-66. Still, those limits preserve a wide-latitude, discretionary space for the executive branch to operate when responding to emergency situations.

Thus, we hold that the legislature's delegation of the suspension of laws and rulemaking necessary to address an emergency under HRS chapter 127A does not violate the separation of powers.

## F. Article I, Section 15 is inapplicable

Last, we address Plaintiffs' article I, section 15 arguments.

Plaintiffs say that the proclamations violate the Hawai'i Constitution because the governor's interpretation of a HRS chapter 127A "emergency" bypasses the "particular cases"

68

requirement under article I, section 15.  They believe that HRS § 127A-13(a)(3) only expressly authorized the suspension of laws in emergency situations.  Because the statute did not expressly authorize the proclamations' specific suspension of laws for housing, Plaintiffs insist the proclamations violate article I, section 15.

These arguments lack merit.

The Hawai'i Constitution's suspension of laws clause only covers the privilege of the writ of habeas corpus.  Article I, section 15 does not apply to suspension of laws unrelated to the writ of habeas corpus.  That constitutional provision reads: "The power of suspending the privilege of the writ of habeas corpus, and the laws or the execution thereof, shall never be exercised except by the legislature, or by authority derived from it to be exercised in such particular cases only as the legislature shall expressly prescribe."  Haw. Const. art. I, § 15. (emphasis added).  "Thereof" references the privilege of habeas corpus.  The "particular cases" requirement is thus specific to suspension of the writ of habeas corpus and related laws.

The emergency proclamations did not violate article I, section 15 of the Hawai'i Constitution.

G.    **Prospective Application**

We understand the potential impacts of our decision on

69

existing affordable housing projects already approved through the expedited certification process.  Thus, this holding only applies prospectively to projects that have not received approval under the emergency proclamations as of final judgment in this case.  See League of Women Voters of Honolulu v. State, 150 Hawai'i 182, 207, 499 P.3d 382, 407 (2021).

## III.

We vacate the circuit court's order dismissing Plaintiffs' declaratory judgment claims.  We hold that the series of emergency proclamations related to affordable housing issued by the governor are valid.

| | |
|---|---|
| Lance D. Collins | /s/ Mark E. Recktenwald |
| (Bianca Isaki, Linda J. Nye, and Ryan D. Hurley on the briefs) | /s/ Sabrina S. McKenna |
| for appellants | /s/ Todd W. Eddins |
| | |
| Ewan C. Rayner | /s/ Lisa M. Ginoza |
| (Craig Y. Iha, Linda L.W. Chow, Klemen Urbanc, Chase S.L. Suzumoto on the briefs) | /s/ Vladimir P. Devens |
| for appellees | |



David L. Henkin
for amici curiae
Nā 'Ohana o Lele Housing
Committee, American Civil
Liberties Union of Hawai'i, E Ola
Kākou Hawai'i, Hawai'i Advocates
for Truly Affordable Housing,
Sierra Club, and Kū'ikeokalani
Kamakea-'Ōhelo